UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| JULIE GREENBANK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:18-cv-00239-SEB-MPB |
| | ) | |
| GREAT AMERICAN ASSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

On November 26, 2018, Plaintiff Julie Greenbank brought suit against Great

American Assurance Company ("Great American") [Dkt. 1-3]. On December 20, 2018,

following the removal of the case to federal court, pursuant to 28 U.S.C. § 1332, Ms.

Greenbank filed her first Amended Complaint alleging eight causes of action: breach of

contract (Count I); bad faith (Count II); theft (Count III); statutory conversion (Count

IV); criminal mischief (Count V); statutory, common law, and constructive fraud (Count

VI); and common law conversion (Count VII), and negligence (VIII). [Dkt. 10]. Now

before the Court is Great American's Motion for Summary Judgment, filed on July 19,

2019, [Dkt. 51], and Ms. Greenbank's Cross-Motion for Partial Summary Judgment, filed

on December 10, 2019. [Dkt. 79]. Both motions were brought pursuant to Federal Rule of

Civil Procedure 56.

Also before the Court are Ms. Greenbank's Motion for Reconsideration, [Dkt. 64],

as well as her Objection to the Magistrate Judge's January 2, 2020 Order, [Dkt. 86].

For the reasons detailed below, we **deny** Ms. Greenbank's Cross-Motion for Partial Summary Judgment. We **grant in part and deny in part** Great American's Motion for Summary Judgment. Ms. Greenbank's Motion for Reconsideration is **denied.** Her objection to the Magistrate Judge's January 2, 2020 Order is **overruled.**

## Background

### I.    General Objections to Evidentiary Submissions

Local Rule 56-1 requires that "a party must support each fact the party asserts in a brief with a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." Great American argues that Ms. Greenbank has proffered numerous facts without citations to proper evidentiary support. We resolve these specific evidentiary disputes as they relate to material facts as needed throughout this Order.

Additionally, both parties, subsequent to the completion of briefing, submitted additional exhibits in support of their respective motions. On February 28, 2020, Great American filed a "Notice of Corrected Exhibits," in which it submitted 40 pages of deposition testimony that had been cited in its brief but omitted as exhibits. Its additional submissions primarily reflect instances in which it either cited and then submitted the wrong portion of deposition testimony or instances where it omitted submitting portions of deposition transcripts that were cited to properly.

On February 14, 2020, Ms. Greenbank submitted her "Supplemental Documents," submitting evidence that she similarly claims was cited in her briefing but inadvertently omitted. Her additional submissions, like Great American's, are reflective of evidence that she cited to but failed to submit as evidentiary support. She also corrects improper

citations in her briefing, directing the Court to the previously submitted exhibit that supports her statement. In total, Ms. Greenbank submitted over *450 pages* of exhibits that were not included in her briefing.

Great American argues that it has been highly prejudiced by this deluge of untimely submissions. Great American maintains that the parties did not commit commensurate errors in submitting their belated exhibits: Great American merely "sought to correct [] omission[s]" whereas Ms. Greenbank sought to "supplement" evidence. We disagree with Great American's description that the parties' errors are qualitatively different—quantitatively different, true—but both have flooded the court's docket with new and belated evidentiary submissions creating at best unfairnesses for opposing counsel and a confused record for the Court to review. Rather than excluding entirely from consideration all of Ms. Greenbank's new submissions—which would seem unjust in light of the parties' shared faults—we shall address and resolve the specific factual and evidentiary disputes as they arise in our analysis. To the extent Great American has been prejudiced by any particular untimely submission by Ms. Greenbank, it shall be noted.

## II. Facts

### A. Ms. Greenbank's Purchase of Thomas and Execution of the Equine Mortality Policy

In September 2017, Ms. Greenbank purchased an American Saddlebred gelding horse named Awesome at This (barn name "Thomas") for $500,000. [Dkt. 51-2, at 3; Dkt. 80, at 9]. At the time of purchase, Thomas was a championed, competitive show horse weighing 959 pounds. [Dkt. 80, at 9-10]. Ms. Greenbank arranged for Thomas to

be boarded and trained at Cedarwood Farms in Evansville, Indiana, which is owned and operated by Chuck Herbert. Mr. Herbert began training Thomas in December 2017. [Dkt. 80, at 9].

Ms. Greenbank and Great American executed a mortality insurance policy (the "Policy") with a major medical endorsement, effective September 28, 2017 through September 28, 2018, providing financial protections for Thomas. [Dkt. 51-2, at 3; Dkt. 80, at 10]. The Policy's mortality coverage was for Thomas's full purchase price of $500,000. [Id. at ¶ 17]. The initial one-year term was set to expire on September 29, 2018, but Ms. Greenbank also purchased a "Guaranteed Renewal Endorsement," which provided a renewal of the Policy year-to-year thereafter. [Am. Compl. at ¶¶ 19-20]. The "death or authorized humane destruction" of Thomas qualified as a covered loss under the Policy so long as Ms. Greenbank complied with various conditions precedent.

First, Section VI(F) of the Policy, in relevant part, provides:

It is a condition precedent of any liability by us under this policy that, in the event of any accident, injury, illness, lameness condition or lameness injury, disease, or physical disability of any kind of or to [Thomas], you do each and every one of the following or have it done by another:
1. [omitted]
2. Give immediate notice to us of the accident, injury, illness, lameness condition, or lameness injury, disease, or physical disability of any kind. Such notice should be given by telephone to us at our **24 HOUR EQUINE OPERATIONS CALL NUMBER: 1-800-331-0211,** and must include (a) a description of the accident, injury, illness, lameness condition or lameness injury, disease, or physical disability and (b) the name and contact information of the qualified veterinarian caring for the "horse"
3. [omitted]
4. Allow us to examine, and if we so require, to assume control over the treatment of the "horse" by a "qualified veterinarian" of our choice, at our expense, and allow the "horse" to be removed for such treatment[.]

4

5.  [omitted]

The Policy further provided:

**PLEASE NOTE**

IMMEDIATE NOTICE OF ANY OCCURRENCE WHICH COULD RESULT IN A CLAIM INVOLVING ANY ANIMAL INSURED UNDER THIS POLICY MUST BE GIVEN BY YOU, YOUR REPRESENTATIVE, OR OTHER PERSONS WHO HAVE CARE, CUSTODY AND CONTROL OF SUCH ANIMAL. NOTICE IS TO BE GIVEN TO GREAT AMERICAN INSURANCE - EQUINE OPERATIONS CALL 24 HOURS 1-800-331-0211. PLEASE ADVISE POLICY NUMBER, NAME OF INSURED, AND ANIMAL INVOLVED, ALSO INCLUDE A TELEPHONE NUMBER TO CONTACT WHERE THE ANIMAL IS LOCATED. GENERAL CONDITION 6 OF THE POLICY STIPULATES THE REQUIREMENTS FOR TREATMENT OF SICKNESS OR INJURY TO AN INSURED ANIMAL. THESE STIPULATIONS MUST BE ADHERED TO IMMEDIATELY WHEN THE CONDITION OR INJURY IS OBSERVED OR KNOWN. IT IS ESSENTIAL TO CONFORM TO ALL THE ABOVE REQUIREMENTS SINCE FAILURE TO DO SO WILL INVALIDATE ANY CLAIM UNDER THIS POLICY.

Section IV(G) outlines the duties of Ms. Greenbank in the event of a covered cause of loss:

It is a condition precedent to any liability by us under this policy that, in the event of any loss of the "horse" because of the occurrence of a Covered Cause of Loss, you do each and every one of the following or have it done by another:

[. . . ]

5. Assist and cooperate with us and our representatives in the adjustment and investigation of any claim or potential claim by:
     a. providing us and our representatives with access to any person(s), information, records and documents we may require; and
     b. submitting and, so far as is within your power causing other persons to submit, to examinations under oath if required by us.

Finally, Section VII(F) provides:

[N]o suit, action or proceeding for the recovery of any sum under this policy may be brought against us unless you have first fully complied with all terms, conditions and provisions of this policy.

B.  Thomas's Declining Health and Great American's Intervention

Concerns about Thomas's health first arose in February 2018, when Mr. Herbert, Thomas's trainer and a veterinary technologist with more than 40 years of experience, sought an assessment from Dr. Raymond Stone, a licensed veterinarian with an equine practice [Am. Compl. at ¶¶ 21-34]. On February 12, 2018, Dr. Stone treated Thomas for colic before diagnosing him with bilateral pleural pneumonia on February 15, 2018. [Dkt. 51-2, at 6; Dkt. 80, at 10]. Dr. Stone determined that Thomas's pneumonia was bacterial and thus began treating him with "heavy antibiotics." [Dkt. 51-2, at 7]. While Dr. Stone communicated primarily with Mr. Herbert, Ms. Greenbank was aware of Thomas's pneumonia at the time of his diagnosis on February 15, 2018.  [Dkt. 51-2, at 7].

Thomas's pneumonia continued into March 2018. On March 6, 2018, Mr. Herbert reported to Ms. Greenbank that Thomas had a "lot of congestion . . . in his trachea." [Dkt. 1-2, at 7]. In late-March 2018, Dr. Stone determined that Thomas's pneumonia was "systemic" and that Thomas was "very sick." [Dkt. 51-2, at 7; Dkt. 80, at 10]. Ms. Greenbank concedes that, by late March, Thomas was "pretty darn sick" and in "critical condition." [Dkt. 51-2, at 8].

Dr. Stone suspected that Thomas was suffering from other ailments at this time as well.  He testified that both he and Mr. Herbert, due to the exudate and odor of Thomas's cough, were concerned that Thomas had a lung abscess. Nonetheless, Dr. Stone believed that "it eventually resolved because the drainage stopped." [Dkt. 80, at 11]. Dr. Stone further noted that by the end of March 2018, Thomas had lost 200 to 250 pounds and had developed cellulitis in all four legs. Thomas had also developed uveitis in his eye.  On

March 26, 2018, Ms. Greenbank inquired of Mr. Herbert whether she should "file" Thomas's medical bills with the insurance company, to which he responded in the affirmative. [Dkt. 51-2, at 9]. Dr. Stone also informed Ms. Greenbank that he recommended referring Thomas to a hospital, but, following a consultation with Dr. Stone and Dr. Clair Latimer, who was an ophthalmologist at Rood & Riddle Equine Hospital, it was decided that Thomas should continue to be treated at Cedarwood.[Dkt. 80, at 11].[1]

In April 2018, Dr. Stone noted that Thomas was responding positively to these treatments. On April 10, 2018, Dr. Stone examined Thomas and reported that his lungs and right eye were now clear, but his left eye remained a little cloudy. On April 13, 2018, Dr. Stone decided that Thomas's pneumonia medication could be decreased considering his improving condition.[2] Dr. Stone continued to decrease Thomas's medication before deciding to ween him off it completely on April 21, 2018.  Mr. Herbert agreed that

---

[1] It is contested who precisely participated in this decision-making process.  Ms. Greenbank asserts that Dr. Stone, Dr. Latimer, and she ultimately agreed to continue treatment of Thomas at Cedarwood. [Dkt. 80, at 11]. Great American rejects the implication that the decision was made by the veterinarians, arguing that only Ms. Greenbank or Mr. Herbert would have had the authority to make this decision. [Dkt. 95, at 12]. Nonetheless, Dr. Stone, though he had no decision-making authority, did not dissent from the decision. [Dkt. 118-2, Stone. Dep., 241-42]. Moreover, Dr. Stone's notes reflect that the decision arose from unanimous agreement among himself, Dr. Latimer, Mr. Herbert, and Ms. Greenbank. [Dkt. 79-36, at 3]. Ultimately, to the extend there was a dispute, it is immaterial to our holdings. Likewise, we need not resolve at this time the parties' dispute over whether Dr. Stone continued to consult with Dr. Latimer on Thomas's eye health.

[2] Great American challenges these averments as improper expert testimony from Dr. Stone, who has not been disclosed as an expert. Ms. Greenbank responds that this information is being offered not as expert testimony, but to establish what notice she had regarding Thomas's health. [Dkt. 122, at 2]. We agree with Ms. Greenbank that these statements may be offered for this purpose.

Thomas's appetite finally was increasing, and his health was improving. [Dkt. 80, at 11]. Ms. Greenbank asserts that by April 29, 2018, Dr. Stone had reported that Thomas "overall appear[ed] better." Great American counters that Dr. Stones's notes from this time do not, in fact, reflect that Thomas was "overall" doing well. Specifically, Dr. Stone had noted that Thomas had pulled his right stifle, rendering him lame in his right hind. [Dkt. 95, at 13].

Not until April 26, 2018 did Ms. Greenbank report to Great American that Thomas was battling pneumonia. [Dkt. 51-2, at 9; Dkt. 80, at 11]. Charlotte Bloxsom, a senior claims adjuster at Great American, was assigned to Ms. Greenbank's claim. [*Id.*] Ms. Bloxsom immediately opened a claim file for Thomas and began the investigatory process into Thomas's pneumonia. [*Id.*].

On May 3, 2018, Ms. Greenbank informed Ms. Bloxsom that Thomas had recovered from his pneumonia and was back in training.[3] [Dkt. 51-2, at 9; Dkt. 80, at 11-12]. However, Ms. Greenbank later confirmed in her deposition that Thomas "had been sick continuously from February until June." [Dkt. 51-2, at 10]. Additionally, at no time

---

[3] The parties also dispute whether Ms. Greenbank misrepresented the fact that Thomas was "in training." Ms. Greenbank asserts that she visited Cedarwood in late April 2018 and observed Thomas lunging on lead line, which Mr. Herbert had confirmed would be a part of his training at Cedarwood. [Dkt. 80, at 12]. Despite Thomas's ailment, Mr. Herbert never had reported to Ms. Greenbank that he would cease training Thomas. [Dkt. 80, at 12]. Thus, she argues, her statements regarding Thomas's training were accurate. However, Mr. Herbert testified that Thomas was not in training from April to June 2018. In April, Thomas was lunged on only three occasions before his cough prevented his further training. [Dkt. 95, at 11]. Additionally, while Ms. Greenbank's brief states that she believed Mr. Herbert was exercising Thomas at this time as a part of a training regime, her affidavit does *not* include this information. [Dkt. 117, at 6; *see generally* Dkt. 79-11]. This dispute need not be resolved at this time as it has no bearing on our ruling.

in her conversations with Ms. Bloxsom did Ms. Greenbank inform her of Thomas's eye issues, leg issues, or weight lost. [Dkt. 51-2, at 10].

On May 7, 2018, Thomas's condition appeared to be in decline. His limp had worsened, and his cough had returned. Mr. Herbert informed Dr. Stone that he "didn't think Thomas was going to make it" [Dkt. 51-2, at 11]. Ms. Greenbank testified that Thomas's limp was so severe that she was afraid to have him walk on it. [Dkt. 95, at 14]. However, she did not discuss any of these new developments with Ms. Bloxsom or any other representative of Great American. [Dkt. 51-2, at 11].

By May 10, 2018, Thomas's health again seemed to be improving, says Ms. Greenbank. Mr. Herbert reported that Thomas was "bright and eating great." Dr. Stone's examination on May 10, 2018, confirmed that Thomas was walking "ok," had a good appetite, and his trachea was clear. According to Dr. Stone's assessment, "Everything appears good, concern is weight loss, but horse finally eating extremely well to rebuild muscle[.]" Following this examination, neither Ms. Greenbank nor Mr. Herbert sought further veterinary assistance from Dr. Stone until June 5, 2018.

Thereafter, Thomas's health apparently remained generally steady until it drastically worsened. On May 14, 2018, an employee at Cedarwood informed Ms. Greenbank that Thomas was "having a good day," and "[i]f he's not walking, he's grazing!!" [Dkt. 80, at 13]. At the end of May 2018, according to Ms. Greenbank, Thomas did not have any trouble walking or standing, and Mr. Herbert thought it

"look[ed] like he might be gaining weight." On June 1, 2018, an employee texted Ms. Greenbank that "Thomas walked great this morning." [*Id.*].[4]

Sadly, these victories proved to be short-lived for Thomas. On June 5, 2018, Mr. Herbert, having grown concerned over Thomas's weight loss, contacted Dr. Stone for a consultation. Dr. Stone examined Thomas on June 5 and 7, 2018, and concluded that Thomas's pneumonia/lung infection had recurred. [Dkt. 80, at 13].[5] Around this same time, Thomas's ability to get up and down was compromised. [*Id.*]. On June 8, 2018, Dr. Stone contacted Ms. Bloxsom and informed her that Thomas's condition had deteriorated and that he "probably" needed to be euthanized. [Dkt. 51-2, at 10; Dkt. 80, at 13; Dkt. 95, at 15]. Following receipt of this information, Great American retained its own veterinarian, Dr. Nathan Slovis, to provide consultation and treatment for Thomas. [Dkt. 51-2, at 10; Dkt. 80, at 13].

Dr. Slovis initially recommended that Thomas be transported to a local clinic for treatment as soon as practicable before concluding that it was in Thomas's best interest to be shipped to his facility in Lexington, Kentucky. [Dkt. 51-2, at 11]. On or about June 8, 2018, Mr. Herbert transported Thomas to Hagyard Equine Medical Institute ("Hagyard") so that he could be treated by Dr. Slovis and his team. It was at this time that Great

---

[4] Great American disagrees that a reasonable person would believe Thomas's health was "improving" or that Thomas was walking without a handicap at this point in time, given that any improvement was sandwiched for brief intervals between severe health concerns. [Dkt. 95, at 14]. Great American also disputes the admissibility of the evidence proffered by Ms. Greenbank in support of her averments, but does not provide a specific basis for its objection. This dispute, like many others, does not require a resolution for purposes of our ruling here.
[5] The parties' dispute whether the pneumonia recurred or was chronic.

American assumed control over the treatment of Thomas pursuant to the Policy provision authorizing that action. [Dkt. 51-2, at 11; Dkt. 80, at 14].

Dr. Kathy MacGillivray was the doctor on call at Hagyard when Thomas arrived and would eventually become Thomas's primary veterinarian while at Hagyard. She evaluated Thomas and determined that he was suffering from a deep lung abscess that had not been visible via Dr. Stone's medical equipment, necessitating a large amount of pus to be drained from Thomas's lungs. Thomas was also diagnosed with laminitis—an inflammation of tissue inside a horse's hoof. Thomas was found to be emaciated as well, warranting a body score of 1, the lowest possible score assignable to him. [Dkt. 51-2, at 11]. Thomas's health condition upon arrival at Hagyard alarmed Dr. Slovis and Dr. MacGillivray, who believed Thomas should have been referred to specialists months earlier. Dr. Slovis was concerned about the lack of treatment Thomas had received while he was in Ms. Greenbank's care, finding it inadequate especially with regard to his "abscess or hoof or feet issues." [Dkt. 51-2, at 11].[6]

The parties dispute whether and to what extent Dr. MacGillivray recommended euthanization following her initial assessment of Thomas. Ms. Greenbank asserts that Dr. MacGillivray informed Great American that Thomas's survival rate was low, making euthanization not unreasonable. ]Dkt. 80, at 14]. However, Dr. MacGillivray testified that

---

[6] Counsel for Ms. Greenbank asserts that this constitutes an expert opinion and that, because Dr. Slovis was never designated as an expert by defendants, it should be disregarded. However, much like the challenge to Dr. Stone's testimony, we view this statements as relevant to a determination of what information was possessed by Great American at the time it took control of Thomas's health. These statements are not received in the record as expert's opinion evidence.

she refrained from recommending euthanization because Thomas had not yet received appropriate health care. [Dkt. 95, at 16]. Specifically, she viewed the true nature of Thomas's health as unclear based on what seemed to be a lack of proper medical treatment. She thus preferred to attempt to stabilize Thomas before issuing a decision on euthanization. [Dkt. 57-5, Claim Notes 158, 161]. Nonetheless, Ms. Greenbank claims that Great American "requested Hagyard to undertake any treatment necessary to keep Thomas alive and [Great American] did not consider whether it was reasonable to euthanize Thomas, his insured use as a show horse,[7] his future athleticism or Julie's insured investment."[Dkt. 80, at 14-15]. This averment, and the underlying factual dispute, require some unpacking, which we will undertake shortly.

On June 11, 2018, Dr. Bryan Fraley, another veterinarian at Hagyard, recommended performing a tenectomy on Thomas, which involved cutting the tendon in his hind leg. Ms. Greenbank believed the procedure would render his future athletic career "unlikely," though it would preserve his life as a pasture horse. [Dkt. 80, at 15]. Ms. Greenbank objected to the procedure, preferring that more conservative treatment options be explored to preserve his future athleticism as a show horse. [Dkt. 80, at 15]. Notwithstanding her objections, though Great American chose not to pursue more conservative treatment options, it denies having refused to consider them. Dr. Fraley testified that there were no more conservative options that would have been viable in saving Thomas's life [Dkt 95-25, at 90].

---

[7]As will be discussed further, it is disputed whether Great American was required to consider Thomas's purported "use" when deciding what treatment plan to employ.

After notifying Ms. Greenbank that her refusal to cooperate with the chosen course of action could jeopardize her ability to receive further coverage under the Policy, Great American directed that the tenectomy be performed on June 11, 2018. [Dkt. 80, at 15; Dkt. 95, at 18]. The next day, on June 12, 2018, Great American instructed Hagyard not to release Thomas to Ms. Greenbank absent Dr. MacGillivray's approval and Great American's permission. [Dkt. 80, at 16]. Ms. Greenbank asserts that this directive not to release Thomas continues to date, though, as Ms. Bloxsom testified, the issue has not been revisited with Hagyard since June 12, 2018.[Dkt. 79-8, at 206].

Great American argues that Thomas responded positively to this surgical treatment and that his condition improved significantly once he was in its care. [Dkt. 51-2, at 13]. Even Ms. Greenbank recognized that Thomas looked healthy, his weight had improved, and he was "moving pretty well." [Dkt. 51-2, at 13]. However, Ms. Greenbank maintains that Thomas has continued to suffer various ailments.

Since his transport to Hagyard, Great American has paid all his medical bills and expenses incurred for his treatment. [Dkt. 51-2, at 13; Dkt. 80, at 17].

C. Great American's Request for Examinations Under Oath and Records

While Hagyard was treating Thomas, Great American continued its investigation of Ms. Greenbank's claims. On September 5, 2018, Great American issued a letter to Ms. Greenbank requesting that she and her agents appear for examinations under oath ("EUOs"), which it asserts was a condition precedent to establishing Great American's liability under the Policy pursuant to Section VI(G)(5). [Dkt. 51-2, at 13; Dkt. 80 at 16-17]. Great American specifically requested that Ms. Greenbank, her husband, Dr. Stone,

Mr. Herbert, Mr. Herbert's assistant, and Mr. Herbert's son appear for EUOs. [Dkt. 51-2, at 13]. Ms. Greenbank was also asked to produce Thomas's veterinary records, training records, and any communications between herself and Mr. Herbert related to Thomas's health. [Dkt. 51-2, at 13; Dkt. 80 at 17].

Ms. Greenbank's EUO was scheduled for December 6, 2018. [Dkt. 51-2, at 14]. However, on November 26, 2018, she cancelled the interview. Instead, that same day, she filed suit against Great American, which Great American claims was in contravention of the Policy's requirement that she submit to an EUO prior to filing suit. [Dkt. 51-2 at 14, Dkt. 80 at 17]. Neither Dr. Stone nor Mr. Herbert and his employees had appeared for their EUOs at the time this lawsuit was filed. [Dkt. 51-2, at 14]. Ms. Greenbank allegedly also had not furnished all of the requested documents as required before initiating this litigation. [Dkt. 51-2, at 14]. She did, however, provide a copy of the complaint to Great American the day it was filed, stating that she would schedule "depositions in the litigation in the near future." Great American did not respond to this request. [Dkt. 51-2, at 17; Dkt. 80, at 25].

Ms. Greenbank generally does not dispute Great American's factual averments on these issues. She does disagree, however, with Great American's interpretation of the policy requirements, which we will take up during our legal analysis.

D. Termination of the Policy

The Policy expired by its term on September 28, 2018. [Dkt. 80, at 17]. While the Policy included a Guaranteed Renewal Endorsement, Great American refused to honor this endorsement. Despite the termination of the Policy, as well as a short-term renewal

executed in lieu of the guaranteed one-year renewal, Great American has retained custody and control of Thomas. [Dkt. 80, at 17].

Great American moves for summary judgment on the majority of the claims against it. Count I of Ms. Greenbank's Complaint asserts four distinct breaches of contract claims for (1) a covered loss, (2) denial of medical expenses, (3) an alternative claim for approving a medical procedure terminating Thomas's insured use, and (4) an alternative claim for denial of the Guaranteed Policy Renewal. Both parties seek summary judgment in their favor on Claim Number (1).[8]

Great American also requests summary judgment in its favor on the remaining claims against it: bad faith (Count II); theft (Count III); statutory conversion (Count IV); criminal mischief (Count V); statutory, common law, and constructive fraud (Count VI); common law conversion (Count VII), and negligence (Count VIII). Ms. Greenbank argues that genuine issues of material fact preclude granting summary judgment on these counts. The parties agree that Indiana law governs all claims.

---

[8] As Ms. Greenbank observes, Great American also appears to be seeking summary judgment on (4), but its argument in support of summary judgment with respect to the alleged breach for failing to renew the Policy is relegated to a single conclusory sentence in an introductory paragraph in which Great American does not even address the language of the Guaranteed Renewal Endorsement nor does it provide any analysis of how its request for summary judgment comports to the terms therein. She argues that such an underdeveloped argument does not suffice to prevail on summary judgment. Indeed, the Court was uncertain whether Great American was even seeking summary judgment on this issue as its briefing omits any clear statement to that effect. Great American offers *no* response to Ms. Greenbank's arguments. While it briefly revisits a discussion of the Guaranteed Renewal Endorsement within its bad faith discussion, it never provides any clarity as to whether it is seeking summary judgment on this issue and, if so, what specific language in the Policy are its arguments being advanced. We suspect Great American's analysis on this issue is largely reflective of its general analysis of all of Ms. Greenbank's various alleged breaches; however, we will not grant summary judgment on such an undeveloped issue.

**Collateral Motions & Issues**

Before turning to the parties' cross-motions for summary judgment, we address two pending collateral motions.

### I. Ms. Greenbank's Motion for Reconsideration

On February 22, 2019, Great American filed a Motion to Preserve Evidence, requesting an order that "preserved the life of Thomas during the pendency of this litigation" by permitting Great American to continue to maintain possession and control of Thomas. We agreed with Ms. Greenbank that a denial of the motion was required based on Great American's "request go[ing] beyond the mere preservation of evidence by seeking to maintain possession of Thomas when it has established no lawful right to do so." We also noted that at that time there was no evidence at risk of destruction, and thus Great American had not provided a proper legal need for a preservation order. [Dkt. 63].

Having ruled in Ms. Greenbank's favor on that motion, the Court was more than a little surprised when it was she who filed a Motion for Reconsideration. In that motion, Ms. Greenbank asserts that the Court's ruling "made a decision outside the adversarial issues presented to the Court by the parties." Specifically, Ms. Greenbank challenges as improper the Court's legal determination regarding Great American's alleged unauthorized control of Thomas. Ms. Greenbank identifies a single sentence in the Order that she characterizes as a "legal determination" in which we stated as follows: "Ms. Greenbank's claim that Great American's continued possession is unauthorized is meritless because Ms. Greenbank never requested Thomas's return, which allowed Great

American the right and duty to retain possession of Thomas." [Dkt. 63, at 3]. She thus requests that we reconsider our Order so that we can redact this statement.

Great American responds that this statement was "merely a reiteration of Great American's arguments," and does not reflect the Court's adoption thereof. Great American is correct. As Great American explains, Plaintiff's Motion for Reconsideration omits mention of the full context of the Court's order, specifically, the context in which the Court issued this statement. That context makes *abundantly* clear that the disputed sentence was contained squarely within a paragraph in which the Court was summarizing Great American's arguments and analysis. It plainly does *not* reflect a substantive legal conclusion by the Court.

Ms. Greenback replies that, if this is the case, "the Court can simply clarify that the statement was the Court's reiteration of Great Argument's argument." We think that is unnecessary given this clarification. Accordingly, we **deny** Ms. Greenbank's Motion for Reconsideration. Of course, now that the parties' cross-motions for summary judgment are ripe for ruling, we are positioned to offer a more fulsome legal analysis of this issue.

## II. Ms. Greenbank's Objection to the Magistrate Judge's Order on Documents Reviewed in Camera

A. Background

On July 26, 2019, Ms. Greenbank filed a Motion to Compel seeking an order compelling Defendant to produce certain documents and respond to deposition questions.

By the time this motion was filed, Ms. Greenbank had served six sets of discovery, comprised of more than one hundred individual requests for documents. These included Ms. Greenbank's Requests for Production ("RFP) seeking, in part, documents relating to the possession, control, and treatment of Thomas, the policies, claims and investigation under the policies, including internal communications, from June 2018 to present. In response, Great American produced more than 5000 pages of documents, including pre and post-suit text communications by Great American personnel, Great American's pre-suit claim notes, post-suit photographs, and videos of Thomas.

On May 7, 2019, Great American produced a 79-page Privilege Log withholding or redacting nearly 800 documents based on confidentiality, relevance, and attorney-client/work-product privileges. Ms. Greenbank took issue with several documents referenced in the original privilege log, demanding to review virtually all of the withheld attorney-client and work-product privileged documents. On June 27, 2019, Great American provided a Supplemental Privilege Log setting forth additional explanations for withholding the items that Ms. Greenbank sought to review. The Supplemental Log specifically referenced responsive documents withheld or redacted under privileges for (i) attorney-client, (ii) work product, (iii) relevance and, (iv) confidentiality.

In her Motion to Compel, Ms. Greenbank requested that Great American be ordered to (1) produce all documents identified in the Supplemental Privilege Log in their native form, without redaction; (2) produce all internal documents and communications, which originated after the filing of the Complaint and are responsive to Plaintiff's Requests for Production in their native form, without redaction (3) produce certain

deponents for second depositions; and (4) be sanctioned in the amount of Ms.

Greenbank's attorneys' fees and costs incurred relating to the Motion to Compel and the

taking of the second (follow up) depositions. The parties were unable to resolve these

issues informally or with the assistance of the Magistrate Judge, who has presided over

no fewer than seven telephonic conferences in an effort to resolve the parties' discovery

disputes.

On December 4, 2019, the Magistrate Judge granted in part and denied in part Ms.

Greenbank's Motion to Compel. The relevant portion of that Order required Great

American to "provide an Amended Supplemental Privilege Log by December 11, 2019,

that further detailed the privilege assertions for its claim notes." As the Magistrate Judge

explained in his order:

> When describing the Claim Note File in the Supplemental Log, Great American
> lumps multiple claim notes in one row, omits the identity of the "sender," i.e., the
> person creating the note, and instead identifies the persons as "Various;" omits the
> identity of the "Receiver" and generally cites "Great American employees and
> outside counsel for Great American;" does not include dates of the redact notes;
> and fails to reasonably describe the subject matter as the "Description" section
> provides no specificity. For example, the Court cannot discern if all the redacted
> Claim notes were pre-suit or if some were post- suit.

[Dkt. 77, at 6]. In the event that Ms. Greenbank, once in receipt of the Amended

Supplemental Privilege Log, maintained her belief that privileges had been improperly

invoked with respect to the claim notes, the Magistrate Judge permitted the parties to

each select up to three claim notes for Great American to produce by December 18, 2019,

for an *in-camera* review. On December 18, 2019, following the production of Great

American's Amended Supplemental Privilege Log,[9] the parties notified the Court that they did, indeed, desire an *in-camera* review. Great American asserted that each disputed claim note was protected from disclosure by the work product doctrine on the grounds that all were created following the initiation of litigation for the purposes of aiding its defense.

On January 2, 2020, following his detailed review of the parties' submission, the Magistrate Judge concluded that Great American had properly exercised its right to withhold the claim notes pursuant to the work product doctrine.

In reaching this conclusion, the Magistrate Judge applied the legal principles underlying the work product doctrine, which had been previously articulated in his December 4, 2019 order. As he explained therein,

> The work-product doctrine, announced in *Hickman v. Taylor*, 329 U.S. 495 (1947), protects otherwise discoverable documents and was codified as Rule 26(b)(3)(A) of the Federal Rules of Civil Procedure and provides:
>
>> [A] party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if: (i) they are otherwise discoverable under Rule 26(b)(1); and (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.. . . If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

---

[9] As noted by the Magistrate Judge, Great American fulfilled its duty to supply the Court and Ms. Greenbank with an Amended Supplement Privilege Log: "Great American supplemented its previous one-row privilege log regarding the entire Claim File with a seven-page privilege log that corrected the aforementioned errors and permitted this Court to conduct a meaningful review." [Dkt. 85, at 2].

To come within the qualified protection from discovery created by Rule 26(b)(3), a party claiming protection must show that the materials sought are: (1) documents and tangible things; (2) prepared in anticipation of litigation or for trial; and (3) by or for a party or by or for a party's representative. *Caremark, Inc. v. Affiliated Computer Servs., Inc.,* 195 F.R.D. 610, 613–14 (N.D. Ill. 2000).

[Dkt. 77, at 18].

The Magistrate Judge thus determined that each disputed claim note was created after the date on which the lawsuit was filed, which caused a significant change in the relationship between the parties. The Magistrate Judge further noted that "Ms. Greenbank has not provided the Court with case law that suggests that post-suit claim notes of this nature are discoverable absent a showing of substantial need," which she had not established. [Dkt. 85, at 3]. In fact, the Magistrate Judge's own research revealed that such claim notes are *not* discoverable. *See Logan v. Commercial Union Ins. Co.*, 96 F. 3d 971, 977 (7th Cir. 1996) (holding that defendants had "clearly" "demonstrated that the documents were created in anticipation of litigation" when all "documents for which [defendant] claimed privilege were written after [plaintiff's] claim had processed, investigated, and denied, and after [plaintiff] had already filed [suit]"); *Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.,* 2014 WL 7360049, at *5 (S.D. Ind. Dec. 23, 2014), *objections overruled*, 2015 WL 1013952 (S.D. Ind. Mar. 9, 2015) (holding that the work-product doctrine applied to documents after the date of a letter which "indicate[d] a significant change in the relationship between the insurer and the insured as the interest of the parties no longer align[ed]. *Compton v. Allstate Property & Cas. Ins. Co.*, 278 F.R.D. 193, 196 (S.D. Ind. 2013) (holding that seven insurance record

entries dated after plaintiff filed her lawsuit need not be produced based on work product doctrine).

We now address Ms. Greenbank's objections to the Magistrate Judge's January 2, 2020 Order.

B. Standard of Review

Rule 72(a) of the Federal Rules of Civil Procedure provides, in pertinent part, that the district court "must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." A finding is clearly erroneous when the reviewing court is "left with the definite and firm conviction that a mistake has been committed." *Brown v. Plata*, 563 U.S. 493, 513 (2011). This is an "extremely deferential standard." *Elder Care Providers of Indiana, Inc. v. Home Instead, Inc.*, No. 1:14-CV-01894-SEB-MJD, 2017 WL 4250107, at *2 (S.D. Ind. Sept. 26, 2017); *see also Pinkston v. Madry*, 440 F.3d 879, 888 (7th Cir. 2006). Additionally, arguments not made before the magistrate judge are normally waived. *United States v. Melgar*, 227 F.3d 1038, 1040 (7th Cir. 2000).

C. Analysis

We note at the outset two significant deficiencies in Ms. Greenbank's objection.

First, she has failed to recognize that an objection to a specific ruling by the Magistrate Judge is not an opportunity to recount every grievance one has with one's adversary or with the Magistrate Judge. To the extent Ms. Greenbank's objections seek remedies or relief for issues unrelated to or unaddressed by the Magistrate Judge's January 2, 2019 Order, they will be disregarded by us as irrelevant, inappropriate and

misguided.[10]  We remind Ms. Greenbank that we have before us for review only the specific findings of the Magistrate Judge as set out in his order to which she has objected.

Second, Ms. Greenbank has completely ignored the substantial deference that the district court judge affords a magistrate judge's ruling in these circumstances. Not once does Ms. Greenbank cite to the appropriate standard of review, and she certainly *never* applies it.  Her objections are interposed in complete disregard of clear statutory authority providing that a magistrate judge's decision is to be overturned only if it is "clearly erroneous."   Her objections are devoid of any argument that the Magistrate Judge committed clear error in concluding that the work product doctrine shielded the disputed claim notes from disclosure.

Notwithstanding these significant oversights, we will briefly address her specific objections.

The gravamen of Ms. Greenbank's objections is that because Great American maintains claim notes as an ordinary business practice and, more specifically, maintained claim notes related to Thomas's health issues,  the disputed claim notes had to have been created in the ordinary course of business. However, this theory ignores the legal authorities that support the Magistrate Judge's finding that a significant change in the relationship between an insured and an insurer that occurs when the two become adversaries in litigation transforms items that once might have been created out of

---

[10] This includes, but is not limited to, her arguments that Great American is "withholding additional claim notes not described on any privilege log" and that Great American has failed to establish that the attorney-client privilege attaches to each disputed claim note.

ordinary business practices into documents created for the purposes of litigation. She

faults the Magistrate Judge for failing to cite a case with facts identical to this one at the

same time she, as the Magistrate Judge observed, cites *no* case supporting a finding that

undermines his. While the cases cited by the Magistrate Judge may possess certain

distinguishing aspects, Ms. Greenbank fails to explain how she believes the Magistrate

Judge's interpretation and application of this case law is clearly erroneous. Indeed, we

hold that his conclusion is entirely consistent with the cases upon which he has relied. *See*

*Logan*, 96 F. 3d at 977; *Indianapolis Airport Auth.*, 2014 WL 7360049, at 5; *Compton*,

278 F.R.D. at 196.[11]

The Magistrate Judge's January 2, 2020 Order was not issued in a vacuum. He has

conducted no fewer than seven conferences with the parties in an effort to facilitate a

resolution of these discovery issues. Prior to conducting his in camera review of the

challenged documents, he had invested significant additional judicial resources in

---

[11] Ms. Greenbank also criticizes Great American's redaction of a column within its Claim File
entitled "Claim Note Topic." She raised a similar issue with the Magistrate Judge when she
requested the *in camera* review. However, as the Magistrate Judge ruled in his January 2, 2020
Order, Ms. Greenbank has waived an argument on this issue for failing to raise it in the earlier
briefing on the Motion to Compel. In her Objection, Ms. Greenbank continues to voice her
disagreement with this redaction. However, we agree with the Magistrate Judge: Ms. Greenbank
had ample opportunity to raise this issue in earlier briefing and did not. She cannot do so at this
much belated time. Her attempts to argue that Great American has improperly redacted a column
entitled "Claim Note Subject" fails for the same reason. Additionally, in her request for *in
camera* review, she argues that Great American's privilege log was a "moving target" because of
its modifications (made pursuant to Court order) to information on the privilege log. The
Magistrate Judge rejected this argument as well, stating that it would not "punish Great
American for complying with this Court's entry requiring a more detailed, amended privilege log
that better served this Court's and Ms. Greenbank's review." Ms. Greenbank's objection renews
her complaint that Great American's privilege log is a "moving target," while offering absolutely
*no* argument to establish any error on the part of the Magistrate Judge.

reviewing and resolving many other issues raised by Ms. Greenbank in her Motion to Compel. Ms. Greenbank's wholly unsupported objections to the Magistrate Judge's January 2, 2020 Order provides no basis on which to derogate from the deference his rulings are entitled to by overturning or revising any of them.

As a final matter, we note that the parties dispute whether Great American's employees' deposition testimony establishes that all of the claim notes were, in fact, created in the ordinary course of Great American's business. We will not venture into the kind of protracted analysis of each deposition that would be required in order to determine whether the evidence supports Ms. Greenbank's theory.

For these reasons, Ms. Greenbank's objection to the Magistrate Judge's Order is **overruled.**

**Analysis**

I.      **Standard of Review**

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

Courts often confront cross-motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief. In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard. *Kohl v. Ass'n of Trial Lawyers of Am.*, 183 F.R.D. 475 (D. Md. 1998). Here, the Court has considered the parties' respective memoranda and the exhibits attached thereto and has construed all facts and drawn all reasonable inferences therefrom in the light most favorable to the respective nonmovant. *Matsushita*, 475 U.S. at 574.

## II.    Discussion

### A. <u>Great American is entitled to Summary Judgment on Ms. Greenbank's Breach of Contract Claim</u>

"Matters involving disputed insurance policy terms present legal questions and are particularly apt for summary judgment." *Erie Indem. Co. for Subscribers at Erie Ins. Exch. v. Estate of Harris by Harris,* 99 N.E.3d 625, 629 (Ind. 2018), reh'g denied (Aug. 23, 2018).

Both parties seek summary judgment as to Ms. Greenbank's allegation that Great American breached the insurance contract when it failed to pay a covered mortality loss provided for in the Policy.  This breach of contract claim is at the heart of the parties' legal disputes. Great American, which has advanced a variety of grounds on which it claims it is entitled to summary judgment on this breach of contract claim, begins with the question: Does the continued survival of Thomas foreclose Ms. Greenbank's entitlement under the Policy to mortality coverage benefits?  Great American maintains

that Thomas's continued existence obviously defeats any claim that Ms. Greenbank has incurred a covered loss under the Policy. Ms. Greenbank disagrees, though her rationale is not so straightforward. We address the parties' respective positions in turn below.

Great American's theory of defense is clear: the Policy that provided coverage was based on Thomas's "Mortality," which is defined in the Policy as the "death" or "authorized humane destruction" of Thomas. Thomas remains neither dead nor destroyed. "No further inquiry in needed," says Great American, arguing that Ms. Greenbank cannot genuinely dispute that she has sustained a covered loss under an equine *mortality* policy when Thomas is still in existence. Having suffered no covered loss, clearly Great American has not breached the Policy by failing to pay proceeds that are contingent on such a loss.

Ms. Greenbank does not agree that the analysis of this issue is so straightforward, arguing that, by seeking EUOs, Great American essentially admitted the existence of a covered loss and cannot now assert otherwise. For context, we revisit Section VI(G)(5) of the policy.

### G. Your Duties In The Event Of A Covered Cause of Loss

It is a condition precedent to any liability by us under this policy that, in the event of any loss of a "horse" because of the occurrence of a Covered Cause of Loss, you do each and every one of the following or have it done by another:
  1. [omitted]
  2. [omitted]
  3. [omitted]
  4. [omitted]
  5. Assist and cooperate with us and our representatives in the adjustment and investigation of any claim or potential claim by:

> a.  providing us and our representatives with access to any person(s), information, records and documents we may require; and
> b.  submitting and, so far as is within your power causing other persons to submit, to examinations under

Ms. Greenbank maintains that, according to the plain language of this provision, her duty to submit to an EOU was triggered only in the event that a "covered cause loss" occurred. Her understanding of Section VI(G) turns on a covered loss being a condition precedent to EUOs.  By demanding that Ms. Greenbank appear for an EOU and subsequently using her failure to appear as a defense, Great American has essentially conceded that a "covered cause of loss" had occurred, argues Ms. Greenbank. She contends that if no covered cause of loss occurred, then she had no duty to appear for an EOU, and Great American should be estopped from using her failure to participate therein as a shield to liability. Accordingly, Great American has effectively pled itself out of the defense that no covered loss occurred, according to Ms. Greenbank, mooting any "need [by the Court to] make a determination of the specific covered loss" that has occurred.

Great American responds that Ms. Greenbank's argument clearly "lacks legal merit[,]" in that it "contradicts principles of Indiana insurance coverage and disregards reality." That reality, is of course, that Thomas is still alive. Great American also raises several defenses to Ms. Greenbank's interpretation of the Policy terms as well as Indiana law, including the absence of any covered loss.  Although it has asserted various alternative defenses, Great American argues that the Court can begin and end its analysis of this issue with the fact that Thomas is, by all accounts, still alive.

We turn to principles of insurance contract construction to determine whether the covered cause of loss provision in the Policy is cancelled or mooted or otherwise overcome by Great American's request for Ms. Greenbank's EOUs.

When interpreting an insurance policy such as this one, "we give plain and ordinary meaning to language that is clear and unambiguous." *United Farm Family Mut. Ins. Co. v. Matheny*, 114 N.E.3d 880, 885 (Ind. Ct. App. 2018), *trans. denied*, 124 N.E.3d 40 (Ind. 2019). The language is unambiguous if "reasonable persons could not honestly differ as to its meaning." *Id.* To this end, we look to see "if policy language is susceptible to more than one interpretation." *Id.* Here, the parties do not dispute that the language is unambiguous, nor could they as the disputed term—covered cause of loss—is defined and clearly only provides insurance coverage for Thomas's death or destruction, neither of which has occurred.[12] *Glob. Caravan Techs., Inc. v. Cincinnati Ins. Co.*, 135 N.E.3d 584, 588 (Ind. Ct. App. 2019), *trans. denied*, 2020 WL 888617 (Ind. Feb. 20, 2020). Pursuant to this definition, with little difficulty, therefore, we reach the conclusion that Thomas's ongoing existence serves as a bar to Ms. Greenbank's claim on the grounds that a covered cause loss has not occurred.

We do agree with Ms. Greenbank, however, that the Policy as written does not permit Great American to condition its own liability on Ms. Greenbank's compliance with the EOUs since the EOU procedure is contingent on the existence of a covered cause of loss. Because a covered cause of loss has not occurred, Great American cannot

---

[12] The Policy also provides coverage for "Theft" and "Wobbler Syndrome," neither of which are at issue here.

use Ms. Greenbank's failure to submit to an EOU before filing suit as a sword against her. While arguably this Policy provision provides that Ms. Greenbank's *claim* of a covered loss triggered her duty to appear for the EUO (an argument implied but never fully articulated by Great American), a plain reading of the Policy does not support that interpretation.[13] In the face of conflicting interpretations, we are required to interpret the Policy in favor of the insured. *Id.*[14] Notwithstanding this beneficial interpretation, this defense is ultimately futile, given our determination that no covered loss has occurred.

Great American's request for EOUs did not constitute a concession that a covered cause of loss occurred. Neither was it a breach of the contract by Great American to have requested the EOUs when it was also challenging the existence of a covered cause of loss. Pursuant to its plain language, the Policy bestows a duty on Ms. Greenbank, in the

---

[13] Great American correctly cites the general rule in insurance coverage disputes than an insured has a duty to submit for EOUs. However, this general rule is contingent on policy language much broader than that in the parties' Policy. For example, insurance contracts often require insured to participate in EOUs in the event of "a loss to which this insurance may apply." *Foster v. State Farm Fire & Cas. Co.*, 674 F.3d 663, 664, 2012 WL 884857 (7th Cir. 2012). That is obviously not how the Policy was written here. We recognize that EOUs serve an important investigatory purpose, so it is unclear (though unnecessary for us to evaluate) why Great American would draft the portion of this Policy so narrowly. Following an exhaustive review, we found no Indiana case law evaluating such narrow language within the context of an EOU provision.

[14] Notably, Great American has not disagreed that a covered cause loss is a condition precedent to Ms. Greenbank's duty to participate in EOUs. However, we do not view Great American's silence on this singular component of the analysis as a complete concession that a covered loss has occurred, as Ms. Greenbank requests that we do. Great American has adamantly, consistently, and veraciously maintained that no covered cause loss has occurred. It would be nonsensical to find that it has conceded this point—the most hotly disputed issue in this litigation—by not responding directly to one facet of Ms. Greenbank's argument. At most, we view Great American's silence as a concession that the Policy should be construed as imposing EOU and production duties upon the insured only in the event of a covered cause loss. Indeed, Great American responds to every other aspect of Ms. Greenbank's argument on this issue, including that it has somehow "pled itself" out of a defense or "waived" its ability to assert an EOU defense.

event of a covered cause of loss, to participate in an EOU. In parallel terms, Great American is entitled under the Policy to assert that Ms. Greenbank has not fulfilled this duty to participate in an EOU. This language in the Policy simply does not justify Ms. Greenbank's interpretation or her insistence that Great American's demand for EOUs relinquished its ability to dispute whether a covered cause of loss occurred. The provision plainly imposes a burden on the insured to act in a particular way in the event of a covered loss; but it does not condition or restrict Great American's right to request EOUs or document production based on the existence of a covered cause of loss.[15]  Great American based its refusal to pay benefits under the Policy in part on its insured's recalcitrance in submitting to the EOU.  However, this must be viewed as an alternative ground for non-payment, and since Great American has claimed the lack of a covered cause of loss as its basis for withholding payment of insurance benefits, it cannot succeed in withholding benefits based on Ms. Greenbank's refusal to participate in the EOU.

We pause to briefly address Ms. Greenbank's argument that Great American has "pled itself out of the defense" of there being no covered cause of loss since Thomas is still alive. This contention is largely interwoven with her argument that Great American conceded a covered loss by requesting EOUs and document production. Ms. Greenbank's

---

[15] Moreover, contrary to Ms. Greenbank's description of the facts, Great American never demanded EOUs or document; rather it *requested* that Ms. Greenbank submit to this obligation under the contract. [Dkt. 51-13]. Further, this request from Great American was made with a full reservation of rights, wherein it specifically stated: "None of our actions, including our requests for documents, your Examination Under Oath, and the four additional Examinations should be considered or construed to be a waiver or estoppel of our rights under your policy with us or applicable law." [*Id.*].

asserttion that Great American has "pled itself out of a case" reflects the principle that "the exercise of a contingent contractual right admits the contingency has occurred." We cannot adopt this argument for two really good reasons. First, we have previously concluded that Great American did not concede the existence of a covered cause of loss by requesting EOUs. Nothing in Section VI(G) conditions Great American's ability to request EOUs on the existence of a covered loss; rather, that Section triggers Ms. Greenbank's duty to comply with any such requests. Second, none of Ms. Greenbank's cited case law supports a finding that Great American has somehow "pled itself out of court" in this fashion.[16]

Moreover, as Great American put it, a contrary finding would defy logic. Under the clear terms of the Policy, a covered cause of loss arises only in the event of Thomas's death. Thomas is not dead, and further, Great American has never mistakenly believed he was dead. Ms. Greenbank has no factual basis on which to assert otherwise. [17]

We conclude this discussion by addressing Ms. Greenbank's claim that Great American has somehow unreasonably prevented Thomas's euthanization. Throughout her

---

[16] *Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008) (plaintiff's arguments suggesting an alternative ground for relief did not allege any facts establishing an "impenetrable defense" to her claim); *Konecranes, Inc. v. Davis,* 2013 WL 1566326, at *3 (S.D. Ind. Apr. 12, 2013) (plaintiff pled itself out of Court when its allegations negated an essential element of tortious interference with business relationship claim);. *Petrakopoulou v. DHR Int'l, Inc*., 590 F. Supp. 2d 1013, 1016 (N.D. Ill. 2008) (counter-claimant may plead itself out of court by attaching documents that show it is not entitled to judgment); *Aluminum Co. of Am. v. City of Lafayette*, 412 N.E.2d 312, 314 (Ind. Ct. App. 1980) (counter-plaintiff "pled itself out of court by affirmatively alleging its claim for malicious prosecution had not yet matured").

[17] This analysis applies with equal force to Great American's claim that Ms. Greenbank failed to properly furnish Thomas's records, a duty also only imposed on her in the event of a covered cause of loss.

recitation of the facts, Ms. Greenbank has broadly alluded to Great American's failure to consider Thomas's "insured use as a show horse, his future athleticism or Julie's insured investment" in its determination of whether to euthanize Thomas. Her legal analysis goes no deeper than to conclusively state, "The facts evidence a 'loss' for 'authorized humane destruction, which Defendant's [*sic*] unreasonably withheld." Not until her discussion of Great American's alleged bad faith does her analysis go any deeper.

Specifically, Ms. Greenbank claims that Great American is not permitted to "unreasonably, arbitrarily, or out of self-interest" withhold its consent to Thomas's euthanization. She cites for this proposition decades-old cases originating from outside Indiana, though she makes little to no effort to apply their principles here.[18] Even assuming her legal arguments are correct, there is no factual support for finding that Great American unreasonably, arbitrarily or otherwise improperly withheld Thomas's euthanization. Ms. Greenbank has consistently sidestepped an accurate recitation of these facts in order to secure a favorable ruling.

Ms. Greenbank alleges that Great American never "consider[ed] whether it was reasonable to euthanize" Thomas. Instead, she says, Great American "ignored two veterinarian opinions that Thomas's condition justified euthanasia[.]" However, there is absolutely *no* evidence in the record to support a finding that Great American "did not

---

[18] See *Schefler v. Livestock & Cas. Ins. Co.*, 44 A.D.2d 811, 355 N.Y.S.2d 608 (App. Div. 1974); *Rosen v. Underwriters at Lloyd's of London*, 100 F. Supp. 825, 825 (E.D. Pa. 1951); *Rodgers v. Ins. Co. of Pa.*, 513 S.W.2d 113, 116 (Tex. Civ. App. 1974).

consider" the reasonableness of euthanization, or that it ignored two veterinarians recommending euthanization. [Dkt. 95-5, 141-147].

The two veterinarians referenced here are Dr. Stone and Dr. MacGillivray. Dr. Stone's involvement was limited to his statement on June 8, 2018 that Thomas "probably" needed euthanized. Dr. Stone plainly did not offer any opinion that Thomas's condition was "incurable" or otherwise indicate that alternative treatments would be unreasonable or inhumane. Additionally, Dr. Stone acknowledged that another option would be to "rework" Thomas's treatment plan. [Dkt. 95-5, 141-147].

Once in receipt of Dr. Stone's opinion that euthanization "might be the humane thing" to do, Great American made note of that recommendation – that Dr. Stone felt that Thomas might need to be euthanized. Great American chose to exercise its rights pursuant to the Policy to take possession of Thomas and to enlist its veterinarians to assess his health.  Great American advised Ms. Greenbank that it intended to retain Dr. Slovis as a consulting veterinarian. [Dkt. 79-15]. Dr. MacGillivray, who oversaw Thomas's initial intake at Hagyard and coordinated his treatment plan, would report to Dr. Slovis.

As with Dr. Stone, Dr. MacGillivray never offered the opinion that euthanization was the only reasonable course of action. To the contrary, though she recognized the very real possibility of needing to euthanize Thomas, her professional opinion was that Thomas should be comprehensively treated before any such decision was made. This opinion was based on her belief that Thomas had not been receiving proper medical treatment or care, and thus she was uncertain as to how he would respond if afforded

adequate veterinarian services. Even the evidence Ms. Greenbank proffers *obviously* reflects this opinion. For example, Claim Note 158 states, in part:

> The horse has two significant issues going on – the chest abscess and the RH foot abscess. If they cannot get him comfortable RH then even if they resolve the chest abscess (which is not out of the question – [Dr. MacGillivray] has resolved cases like these before) – then she will RX humane euthanasia. It would not be unreasonable to make that recommendation now – but she does not want to do so sine [*sic*] the horse has received no treatment for these issues, and she believes that they should at least try to see if they can improve his comfort and treat the abscess with the understanding that the prognosis is guarded. Dr. MacGillivray expressly stated that there were treatments that could have been performed that were not, she does not know why and no one has given her a reason why not[.]

Moreover, there is simply *no* evidence that Great American was ignoring veterinarian advice in selecting a treatment plan. In support of this claim, Ms. Greenbank cites Ms. Bloxsom's deposition testimony, which, once again, does not establish the point Ms. Greenbank is attempting to make. Ms. Bloxsom testified that Great American had "employed a qualified veterinarian" and was following their recommendations regarding treatment. [Dkt. X, at 152.] This included "treating the horse according to its symptoms and see[ing] how he improved." [*Id.* at 195].

Ms. Greenbank, despite the criticisms of Great American for these mischaracterizations of the facts, still has offered *no* rebuttable. She offers no further evidentiary support for her claim that Great American ignored veterinarians' recommendations to euthanize Thomas. Indeed, the evidence supports an opposite finding: that Great American knew euthanization was possible, but that its chosen veterinarian (whose credibility as a vet has *not* been questioned) believed that it was prudent to treat Thomas's ailments, and Great American followed this advice.

We move next to address Great American's claim that Ms. Greenbank has misrepresented the meaning of Thomas's "insured use," and, more specifically, that Ms. Greenbank improperly argues that Great American failed to consider this "insured use" when making decisions for Thomas's health. [Dkt. 95, at 17].

Ms. Greenbank's repeated references to Thomas's "insured use" refers to another provision in the Policy that provides mortality coverage so long as Thomas had been used only for his specified permitted purpose, which was that of a show horse. [Dkt. 1-3, Sec. VI(C)]. As Great American explains, this provision simply means that Ms. Greenbank would not have been entitled to coverage if Thomas had been used in a different category of activity without first receiving Great American's authorization. It does not, as Ms. Greenbank appears to believe, provide coverage for Thomas's use only as a show horse. Importantly, says Great American, Ms. Greenbank did not even have coverage for "loss of use," that is, the Policy did not provide coverage in the event Thomas was unable to perform as a show horse. Thus, argues Great American, it had no duty to consider "Thomas's future athleticism" or Ms. Greenbank's "investment" in Thomas as a show horse, when reaching its decisions for Thomas's healthcare. [Dkt. 95, at 17, Dkt. 95-2, at 151-52, 195].

Ms. Greenbank offers minimal rebuttal on this point. She does not dispute Great American's construction of the Policy language, which appears to comport with a plain reading of the "permitted use" provision,[19] or explain how this provision otherwise

---

[19] Section VI(C) specifically provides: "It is a condition precedent of any liability by us under this policy that no 'horse' is used at any time during the 'policy period' or during any extensions

entitles her to insurance coverage for Thomas's use as a show horse. Nor does she offer any other explanation as to why Great American would have been required to consider Thomas's "use" when deciding his course of treatment pursuant to this provision absent coverage for "loss of use." Instead, she argues that, by rendering Thomas a pleasure horse, Thomas would no longer be used for his permitted purpose and Great American would have voided her ability to receive benefits.

This argument, importantly, reveals Ms. Greenbank's understanding of the purpose of the permitted use provision, which is *not* to provide her coverage for Thomas's use as a show horse but rather to define the scope of the disciplines (and ultimately what risks) he may be exposed to. Moreover, even if Thomas's use as a pleasure horse were a separate "discipline", as Ms. Greenbank believes (though Great American disagrees), there is simply no indication that Great American would have voided Policy coverage on the grounds that its own actions taken pursuant to the Policy altered Thomas's use.

Ms. Greenbank's minimal response to these arguments and Policy provisions leaves her without a claim against Great American on this basis.[20] Nothing within the

_____

of coverage for any purpose that is not specified in the Declarations. If you intend to use a 'horse' for a purpose other than that specified in the Declarations, you must notify us in advance of that use and secure our agreement in a written endorsement to insure the "horse" for that other purpose. If we agree to do so, we may condition our agreement on the payment of additional premium."

[20] Though briefly touched upon, but not directly at issue in the parties' summary judgment briefing is the question of whether Great American committed a breach of contract by approving the tenectomy. We encourage Ms. Greenbank to consider the viability of this claim before pressing forward with it in light of our ruling on the permitted use provision.

Policy mandated that Great American consider Thomas's value as a show horse in its decision-making process with regard to his care.

Finally, we note that while Ms. Greenbank presents certain information related to Thomas's ongoing health issues during the period he was in Great American's care, she *never* advances any substantiated claim that Great American's ongoing medical care of Thomas was somehow inhumane (aside from an allegation in her Amended Complaint and a conclusory statement that it is "cruel" of Great American to keep a "blank check" to keep Thomas alive).[21]  She does not contend that Thomas's health was so deteriorated that it was inhumane and unreasonable to keep him alive rather than to euthanize him. Instead, her argument on these issues has focused entirely on how Great American's medical treatment of Thomas destroyed his economic value as a show horse and that his continued, costly care as a pasture horse is unreasonable in light of his supposed "insured" use.

Ms. Greenbank disagrees with Great American's decisions, apparently preferring that Thomas be euthanized rather than rendered a pasture horse. However, she has offered no cogent analysis as to how this belief entitles her to insurance proceeds pursuant to the Policy. We cannot conclude that an "unreasonable withholding" gives rise to a covered cause of loss when Ms. Greenbank has not supported her claim of "unreasonableness" with any reasoned discussion supported by law or fact.

---

[21] Ms. Greenbank also accuses Great American of "sugar coating" Thomas's current health status. In response, Great American argues it is being entirely forthright  and proactive in its communications regarding Thomas's health. Ms. Greenbank does not offer any rebuttal.

Having determined that no covered cause loss has occurred, we need not review the parties' remaining arguments on this issue. Summary judgment is **granted** for Great American on this breach of contract claim against it.

B. <u>Great American is Entitled to Summary Judgment on Ms. Greenbank's Bad Faith Claim for Denial of Coverage</u>

Ms. Greenbank argues that Great American breached its duty of good faith when it denied coverage pursuant to the Policy's mortality provision.

"Indiana law has long recognized that there is a legal duty implied in all insurance contracts that the insurer deal in good faith with its insured." *Allstate Ins. Co. v. Fields*, 885 N.E.2d 728, 732 (Ind.Ct.App.2008). This obligation includes the duty to refrain from: "(1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in payment; (3) deceiving the insured; and (4) exercising an unfair advantage to pressure an insured into settlement of his claim." *Knowledge A-Z, Inc. v. Sentry Ins.*, 857 N.E.2d 411, 422 (Ind. Ct. App. 2006). "A claim of bad faith based on a denial of coverage or refusal to pay exists when the insurer denies a claim despite knowing it lacks a rational, principled basis for doing so." *HMV Indy I, LLC v. HSB Specialty Ins. Co*., 413 F. Supp. 3d 801, 806, 2019 WL 4193378 (S.D. Ind. 2019).

The Court has determined as a matter of law that Great American did not improperly deny mortality coverage. Accordingly, it cannot be found to have acted in bad faith. *Kartman v. State Farm Mut. Auto. Ins. Co*., 634 F.3d 883, 891, 2011 WL 488879 (7th Cir. 2011); *Shifrin v. Liberty Mut. Ins*., 991 F. Supp. 2d 1022, 1045, 2014 WL 87877 (S.D. Ind. 2014). Notwithstanding this conclusion, we briefly review Ms. Greenbank's

related arguments with respect to her position that her bad faith claim should survive summary judgment.

First, Ms. Greenbank argues that Great American "intentionally disregarded" Policy terms by requesting that she participate in EOUs despite denying this existence of a covered cause of loss. However, she offers no explanation for the way in which this argument supports a finding of bad faith in the event that Court ruled against her on the coverage claim. While we agree that Great American is foreclosed from using her failure to participate in the EOUs prior to initiating suit against her, Ms. Greenbank insufficiently explains how Great American's conduct in this regard reflects "ill will" as opposed to a good faith dispute as to construction of the EOU provision.

Ms. Greenbank claims that Great American's admission that it is "cheaper to pay Thomas's continued treatment than a mortality claim" "evidences [its] dishonest purpose and ill will." Her contention is based on an e-mail exchange between Ms. Bloxsom's supervisor, Meriweather Moore, and Kathy Coyne, Great American's Vice President for its Equine Mortality Provision, during which Ms. Moore stated, "Yikes!! I can't believe we're still incurring bills like that 4 months out." Ms. Coyne responded, "I guess it is better than $500k ! ! !" Ms. Greenbank places too much stock in the evidentiary value of this passing statement by Ms. Coyne. In fact, this e-mail does not show that Great American acted dishonestly "in refusing to pay the admitted Covered Cause of Loss and keeping Thomas alive just to avoid such a claim." The only things it reflects is Ms. Coyne's acknowledgement that they were paying less in Thomas's medical expenses than $500,000. Clearly, what the e-mail does *not* show is that Great American deceitfully

concocted a plan to preserve Thomas's life with complete disregard for his health, as Ms. Greenbank apparently believes occurred.

Finally, we review Ms. Greenbank's argument that Great American created for itself a conflict of interest when it took control of Thomas's health. Specifically, she argues that Great American's conduct placed it in the roles of both insurer and insured. However, her proffered cases simply do not support a finding that an insurer acts in bad faith when its asserts control over the insured property. *See Stephan v. Unum Life. Ins. Co. of Am.*, 697 F. 3d 917, 929 (9th Cir. 2012) (evaluating whether claims administrator violated fiduciary duties imposed by ERISA); *Snodgrass v.* Baize, 405 N.E.2d 48, 53 (Ind. Ct. App. 1980) (evaluating conflict of interest between insured and insurer within the duty to defend context). She further claims that Great American's interest conflicted with her own, though she offers no explanation as to how this gives rise to a bad faith claim. Finally, she acknowledges that Great American had instructed veterinarians at Hagyard to act in Thomas's interest, yet, once again,  fails to offer any coherent analysis as to how this gives rise to a bad faith claim.  Apparently believing that any act taken by Great American which did not exclusively and directly serve her desire to receive a pay out of the Policy benefits was in bad faith will not carry the day in preserving these claims.[22]

What remains still unaddressed by the court is whether Great American acted in bad faith by either 1) denying coverage for certain medical expenses or 2) refusing to

---

[22] For example, Ms. Greenbank takes issue with the fact that, "Dr. MacGillivray was an advocate for Thomas's interests and not [Ms. Greenbank's] interests." [Dkt. 80, at 48].

honor Ms. Greenbank's Guaranteed Renewal Endorsement.[23] Because the breach of contract allegations underlying the related claims of bad faith have yet to be resolved, we cannot determine at this juncture whether these alleged breaches were committed in bad faith.

C.  State Law Claims

Great American has moved for summary judgment on Ms. Greenbank's state law claims, brought pursuant to Indiana common law and the Indiana Crime Victims Relief Act ("CVRA"), Ind. Code § 34-24-3-1 (2019), which affords victims of various crimes a civil remedy. Ms. Greenbank's claims for theft, statutory conversion, criminal mischief, and statutory fraud are governed by the CVRA, whereas her claims for common law fraud and common law conversion as well as her negligence claim are not.

Great American has incorporated by reference its brief in support of its Motion for Judgment on the Pleadings, which the Court previously denied. In our denial, we noted that Great American had sought dismissal of  all of Ms. Greenbank's state law claims on the grounds that she had not properly pled that Great American had exercised "unauthorized control or possession of Thomas." However, we ruled there that Great

---

[23] This includes her bad faith claims that Great American denied medical expenses without a rational basis and that Great American improperly issued a "sham policy" for limited coverage rather than honoring the Guaranteed Renewal Endorsement. We have disregarded at this time certain additional bad faith arguments that seemingly have no connection to any of the coverage disputes. For example, Ms. Greenbank asserts that a Great American employee improperly shared a video of Thomas to friends, family, and others stating "it was the worst case of abuse and neglect she had ever seen." Though this may have violated Great American's internal ethical or confidentiality policies, Ms. Greenbank does not explain how such internal violation also offends the contractual principles of bad faith. Similarly, Ms. Greenbank offers no explanation as to how Great American's continued control of Thomas implicates bad faith.

American had failed to recognize (a failure which continues in its summary judgment briefing) that "unauthorized control" is as element only of theft, statutory conversion, and common law conversion, *not* criminal mischief or fraud. We also rejected Great American's contentions that unauthorized control had been insufficiently pled on the grounds that the Policy authorized such control, explaining therein:

> Great American never acknowledges Ms. Greenbank's non-contractual allegations. Great American places the full weight of its argument on the Policy provisions authorizing its possession and control of Thomas but does virtually nothing to address the portion of these legal claims based on its actions after the termination of the Policy and outside of its terms. Even if we were fully persuaded by Great American's argument that it acted appropriately pursuant to its unambiguous contractual authorization when it took possession and control of Thomas, and even if there were no disputed factual matters on this issue, we could not find for it. Each of these legal claims incorporates Ms. Greenbank's allegations that Great American continued to maintain possession and control of Thomas after the termination of the Policy and to the date of the Operative Complaint without her consent.

Great American repeats many of these deficiencies in its summary judgment briefs. Notwithstanding these shortcomings, we shall undertake a review of whether Great American is entitled to summary judgment on any of Ms. Greenbank's state law claims against it.

1. *Great American is Entitled to Summary Judgment on Ms. Greenbank's Conversion Claims with Respect to its Continued Control of Thomas*

Ms. Greenbank charges Great American with having committed tortious and statutory conversion by exerting unauthorized control over Thomas following the termination of the Policy.

The parties dispute the legal elements of conversion under Indiana law, both ignoring the fact that Indiana imposes separate elements depending on whether the

plaintiff is alleging tortious conversion or criminal conversion pursuant to the CVRA. Specifically, the parties disagree as to whether in alleging conversion, an essential component of which is the defendant's unauthorized control regardless of whether one is pursuing a criminal or tortious conversion action, the plaintiff must "demand" the return of the property. Ms. Greenbank says no, Great American says yes. Both are partially correct.

With respect to Ms. Greenbank's allegations that Great American committed tortious conversion by retaining unauthorized possession and control of Thomas following the termination of the Policy, demand may be necessary. As this Court has explained, "Where the initial possession is lawful, civil conversion occurs only after an unqualified demand for return." *O.K. Sand & Gravel, Inc. v. Martin Marietta Corp.*, 786 F. Supp. 1442, 1450 (S.D. Ind. 1992) (*quoting Coffel v. Perry*, 452 N.E.2d 1066, 1069 (Ind. Ct. App.1983); *see also Aaron MacGregor & Associates, LLC v. Zhejiang Jinfei Kaida Wheels Co.,* 328 F. Supp. 3d 906, 929, 2018 WL 3062404 (N.D. Ind. 2018). However, if the initial possession was unlawful, the tort victim need not issue an unqualified demand. *O.K. Sand & Gravel, Inc.,* 786 F. Supp. at 1450. Statutory conversion, on the other hand, does not require a plaintiff to make a demand for return. *Id.* ("The elements necessary to establish conversion are those found in the criminal statute . . . While a demand for return may be evidence as to the intent element, it is not itself an element of criminal conversion.")

We begin our review of Ms. Greenbank's tortious conversion claim noting that it is uncontested between the parties that Great American's initial possession and control of

44

Thomas was lawful by virtue of its Policy rights. Accordingly, Great American is correct in maintaining that Ms. Greenbank was required to make an "unqualified demand" for return in order for this claim to survive summary judgment. *Aaron MacGregor*, 328 F. Supp. 3d at 239. It is further uncontested that no demand has occurred.[24]

However, she may be excused from making a demand if "such a gesture would have been futile." *See O.K. Sand & Gravel*, 786 F. Supp. at 1450. Futility may be found, for example, when the property has been disposed of or destroyed, or where the tortfeasor assumes a position establishing that any demand would be fruitless *See id.*; *Tucker v. Capital City Riggers*, 437 N.E.2d 1048, 1051 (Ind. Ct. App. 1982).

Ms. Greenbank claims that such "futility" existed here. Rather than explaining how this is so, she provides several citations to deposition excerpts and communications between herself and Great American, none of which support a finding of futility. Ms. Bloxsom's deposition, and the text message between Ms. Bloxsom and Dr. MacGillivray, merely establish that, at the time Great American took control of Thomas's healthcare, it directed Hagyard not to release Thomas to Ms. Greenbank absent a recommendation to do so by Dr. MacGillivray and Great American's approval. Ms. Bloxsom further testified that she had not revisited the topic with Great American following the termination of the Policy. Nothing in these deposition excerpts indicates how Great American would have responded to a demand from Ms. Greenbank following the termination of the Policy.

---

[24] That the filing of this lawsuit could be interpreted as a demand or an objection to Great American's continued control of Thomas is not an argument raised by Ms. Greenbank and not one the Court will construct for her.

Ms. Greenbank also cites the deposition testimony of Ms. Coyne, which Ms. Greenbank argues reflects Great American's opinion that any request for the return of Thomas would have to go through "lawyers and the courts." However, her citation does not direct the Court to any such testimony. Moreover, with the help of Great American, the Court located the testimony to which she was apparently referring, which does *not* support a finding that a demand for Thomas would be in vain.[25] Rather, Ms. Coyne, when questioned on the topic, responded:

> If Mrs. Greenbank decided she wants the horse, then that would be -- obviously, it's still her animal.· She could pick it up.· But based on our litigation, that may be something that would have to go through the attorneys and the courts.

[Dkt. 95-18, at 111]. Merely acknowledging that, because of ongoing litigation, the courts *may* have to become involved cannot reasonably be said to render any demand "futile" in light of the fact that Ms. Coyne clearly testified that Thomas belongs to Ms. Greenbank, and thus he is hers to "pick up" if she wanted to do so.

Ms. Greenbank also cites an Indiana Supreme Court case from 1859 for the proposition that "proof that the defendant promised to return the goods to the plaintiff, and that he had not returned them, is sufficient evidence of a conversion, without showing a demand and refusal." *The Michigan Southern and Northern Indiana Railroad Company v. Bivens*, 13 Ind. 227 (Ind. 1859). She argues that this applies where "an insurance company exercises a right under a policy to take the insured's property and

---

[25] Ms. Greenbank has not argued that Great American, by virtue of its Motion to Preserve Evidence in which it sought a court order authorizing its continued control of Thomas, reflects its position that any demand from her would have been in vain. Again, as reiterated throughout this entry, the Court will not construct the parties' arguments for them.

subsequently terminates the policy and fails to return the insured's property." Ms. Greenbank's argument is largely conclusory and undeveloped. Significantly, it fails to comport with the modern rule that tortious conversion, in the context of what was once lawful possession, necessitates demand. Additionally, she cites no authority supporting her interpretation that the termination of the Policy translates into a "proof of a promise to return" such that any demand would have been futile.

We next turn to Ms. Greenbank's claim for statutory conversion, for which a "demand" is not a prerequisite. However, the lack of a demand may negate the necessary *mens rea* element of statutory conversion, that is, that the defendant's knowing or intentional exertion of unauthorized control over another's property. *Smeigh v. Johns Manville, Inc.,* 643 F.3d 554, 563, 2011 WL 2555819 (7th Cir. 2011); *O.K. Sand & Gravel, Inc.*, 786 F. Supp. at 1451. This is because, without a demand, a party may not "know" that it has exerted unauthorized control of another's property. *Id.* Additionally, A defendant's reasonable belief that it has controlled or continued to control property with the owner's consent defeats the *mens rea* element of conversion. *Smeigh*, 643 F. 3d at 563. *Whitlock v. Brown*, 596 F.3d 406, 413 (7th Cir. 2010).

Great American argues that Ms. Greenbank's lack of demand and apparent apathy as to whether Great American retained possession of Thomas serves to show that Great American has not "knowingly or intentionally" maintained unauthorized control of Thomas. Specifically, Great American stresses that Ms. Greenbank has *never* requested the return of Thomas. Once the Policy ended, Ms. Greenbank did not object to Great

American's continued care of him, nor has she voiced any objections since that time. Additionally, Great American's counsel has submitted sworn affidavits stating that Ms. Greenbank's counsel represented to them in a February 2019 telephonic status conference that Great American could keep Thomas. [Dkt. 95-2]. Specifically, Great American reports that the following exchange occurred:

> Magistrate Judge: Do you want the horse or not?
> Ms. Greenbank's Counsel: No, as far as we are concerned they can keep it

Ms. Greenbank's sole response to these averments is that Great American has "failed to explain" how the "essence" of a telephone call was transcribed to a verbatim quote. However, she offers no objection to the "essence" of those statements nor the admissibility of the affidavits. [Dkt. 108, at 3]. Great American claims that it relied on these representations as well as Ms. Greenbank's lack of objections, and thus reasonably believed that it was authorized to maintain control of Thomas following the termination of this Policy.

We find these circumstances analogous to those presented to the Seventh Circuit in *Smeigh v. Johns Manville, Inc. Smeigh*, 643 F. 3d at 554. In *Smeigh* an individual terminated by his employer charged the employer with unlawfully retaining his personal property after his termination. *Id.* at 557. At the time of his termination, the individual was informed that his locker would be cleaned out and his personal property returned. When some of his property was not returned, he accused his employer of committing statutory conversion. *Id.* The Seventh Circuit affirmed the district's grant of summary judgment for the employer, noting that the individual had never objected to his former

48

employer retaining his property at the time of his termination, nor had he ever demanded the return of his property. *Id.* at 564-65. Based on these inactions, the Seventh Circuit concluded that the individual had failed to present evidence which could raise a reasonable inference that the possession was knowingly unauthorized. *Id.*

In similar fashion, Ms. Greenbank has not objected to Great American's continued control of Thomas, she has not demanded his return, and she has not offered any other argument or an explanation that would support a finding that Great American has knowingly acted without authorization in its continued control of Thomas. Her arguments distilled down into her belief that demand was not necessary, and, if it was, it would have been futile. These arguments simply cannot withstand the weight of authorities and evidence that say otherwise.

While determining if a defendant acted with the requisite *mens rea* is generally a question of fact, there is no evidence before us that would allow a reasonable juror to conclude that Great American "knowingly or intentionally" exercised unauthorized control over Thomas as necessary to establish liability under the CVRA. Accordingly, Summary Judgment is **granted** for Great American on these claims. [26]

---

[26] Ms. Greenbank also accuses Great American of committing tortious and statutory conversion by converting her money into a "sham" short-term renewal policy. Though Great American briefly touches on this issue in its responsive briefings, this question has not been fully briefed in a manner that is amenable to a summary judgment ruling. Accordingly, Counts IV and VII survive summary judgment to the extent they relate to alleged conversion of Ms. Greenbank's money.

*2. Summary Judgment Must Be Granted to Great American on Ms. Greenbank's Allegations of Theft*

Ms. Greenbank next accuses Great American of theft pursuant to the CVRA, which imposes liability against individuals who knowingly or intentionally exert unauthorized control over another's property with the intent to deprive the other person of any part of its value or use. Ind. Code. § 35-43-4-2. Much like statutory conversion, an essential element of theft is one's "knowing or intentional unauthorized control." Because no evidence exists that would support a finding that this element has been satisfied, summary judgment is **granted** for Great American on this claim.

*3. Great American is Not Entitled to Summary Judgment on Ms. Greenbank's Claims of Fraud & Criminal Mischief*

Ms. Greenbank has also brought claims for common law, statutory, and constructive fraud as well as criminal mischief. Ms. Greenbank's claims for fraud are based on Great American's alleged false representations to Ms. Greenbank with respect to her policy rights, which were relied upon to her detriment. [*See* Am. Compl. ¶ 113-122]. Her claim of criminal mischief is based on her belief that Great American unlawfully "damaged" Thomas. [*Id.* ¶ 108-112].

Great American requests summary judgment in its favor for each of these claims; however, Great American offers no explanation as to why summary judgment is warranted. The gravamen of Great American's arguments with respect to these claims is that, because it did not act with the requisite *mens rea* to commit conversion or theft, it could not have acted with the requisite intent to commit fraud or criminal mischief. However, the *mens rea* element of theft and conversion relates to the defendant's

knowledge or intent when maintaining the alleged "unauthorized control" of another's property, which is not an element of fraud of criminal mischief. Indeed, Great American *never* even addresses the elements of the various alleged frauds nor criminal mischief, and it also fails to offer any analysis as to how this finding in the context of conversion and thefts comports to an analysis of fraud and criminal mischief. Additionally, whether one acts with the necessary *mens rea* is inherently a factual question, yet Great American, by failing to completely address the law or apply it to the facts, has not produced in us the firm conviction as to the right result. Its incorporation of its flawed Motion for Judgment on the Pleadings briefing certainly does not save it.

We will not grant summary judgment in Great American's favor on these claims when it has presented no cogent analysis as to why such a ruling is warranted.

4. *Great American is Not Entitled to Summary Judgment on Ms. Greenbank's Negligence Claim*

We turn now to Ms. Greenbank's final claim against Great American: common law negligence. [27] To establish a claim of negligence, a party must show: (1) a duty owed to the plaintiff by the defendant; (2) a breach of that duty by the defendant; and (3) an injury to the plaintiff proximately caused by that breach. *Severance v. New Castle Cmty. Sch. Corp.*, 75 N.E.3d 541, 546 (Ind. Ct. App. 2017).

---

[27] We note that Ms. Greenbank concludes her briefing by presenting a confusing argument that she is "entitled to judgment" on several of Great American's affirmative defenses disclosed in its Statement of Defenses, which it was required to produced pursuant to the parties' Case Management Plan. She also asserts that Great American's "fraud/misrepresentation defense" fails as a matter of law. Beyond our discussion of Great American's affirmative defenses as they relate to the specific issues raised in the parties' summary judgment briefing and this Order, it is completely unclear why the Court would at this point in the proceedings analyze the viability of these defenses, let alone grant her judgment on said defenses.

Ms. Greenbank alleges that Great American owed her a duty "to use reasonable care to protect [her] investment in Thomas while in [Great American's] possession, to act in [her] best interest and to not take action contrary to [her] interests so as to damage [her] property." [Am. Compl. ¶ 128]. She claims that Great American breached this duty, causing her damages. Great American presents two argument in support of its request for summary judgment on this claim. First, that the negligence claim is barred by the "Economic Loss Doctrine," and second, that Ms. Greenbank has not suffered damages. Great American does not address the "duty" or "breach" elements of Ms. Greenbank's negligence claim.

The Economic Loss Doctrine provides that "a defendant is not liable under a tort theory for any purely economic loss caused by its negligence. *Indianapolis-Marion Cty. Pub. Library v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 729 (Ind. 2010). Pursuant to this doctrine, Indiana courts, including this one, have barred negligence actions that sound exclusively in contract law. *See First Internet Bank of Indiana v. Lawyers Title Ins. Co.*, 2009 WL 2092782, at *8 (S.D. Ind. July 13, 2009). According to Great American, any claims for losses with respect to Thomas's value could be resolved by virtue of the Policy provisions, and thus the Economic Loss Doctrine forecloses Ms. Greenbank's negligence claims.

Ms. Greenbank responds that the Economic Loss Doctrine would not bar any claims for damages that she may have incurred while Thomas was in Great American's care following the termination of the Policy. She also asserts the she is permitted to plead her state law claim in the alternative to her contract claim.

Great American offers a rebuttal only to Ms. Greenbank's second argument; it does not explain how the Economic Loss doctrine would bar Ms. Greenbank's negligence claim to the extent it relates to any damages incurred following the termination of the Policy. We concur with Ms. Greenbank that any damages which occurred post-termination would be outside the purview of the parties' contract.

Great American also asserts that Ms. Greenbank has not suffered any damages. The Court finds it prudent to refrain from offering any opinion as to whether Ms. Greenbank may have suffered any compensable injuries resulting from Great American's negligence on the grounds that the parties' briefings on this issue are wholly underdeveloped, leaving the Court with more questions than answers.

For example, Great American first asserts that Ms. Greenbank has not suffered any damages because Thomas is alive. Ms. Greenbank responds that Great American ignores any damages as to Thomas's value that may have resulted from Great American's continuing care of Thomas following the termination of the Policy. Great American replies that any loss would have been the result of the tenectomy, which occurred during the Policy period. Great American does not address Ms. Greenbank's claim that Thomas's value may have lessened because of action taken later on. Nor does it, for example, argue that Thomas's value has not decreased since it came into Great American's possession and thus Ms. Greenbank has suffered no compensable damages. Though Great American may harbor a legitimate level of skepticism as to any such damages, it has not provided any thoughtful, reasoned analysis of this issue, and thus the Court cannot grant summary judgment on this basis.

<u>**CONCLUSION**</u>

Great American's Motion for Summary Judgment [Dkt. 51] is **granted in part and denied in part.** Ms. Greenbank's Cross-Motion for Partial Summary Judgment [Dkt. 79] is **denied.**

- Great American's Motion for Summary Judgment is **granted** with respect to Ms. Greenbank's claim for breach of contract (Count I) on the basis that Great American improperly denied Ms. Greenbank's claim for mortality coverage. Ms. Greenbank's Cross-Motion on this same issue is **denied.** Ms. Greenbank's remaining breach of contract claims in Count I that were not addressed by this Order relate to Great American's denial of medical expenses, Great American's approval of the tenectomy, and Great American's denial of the Guaranteed Policy Renewal.

- Great American's Motion for Summary Judgment is **granted** with respect to Ms. Greenbank's bad faith claim (Count II) as it specifically relates to the denial of mortality coverage.

- Great American's Motion for Summary Judgment is **granted** for Count III (theft).

- Great American's Motion for Summary Judgment is **granted** for Count IV (Statutory Conversion) and Count VII (Tortious Conversion) to the extent these claims relate to Great American's unauthorized control of Thomas following the termination of the Policy. Great American's Motion for Summary Judgment on Counts IV and VII is **denied** with respect to the alleged conversion of Ms. Greenbank's funds.

- Great American's Motion for Summary Judgment is **denied** with respect to

  Counts V (Criminal Mischief), Count VI (Fraud), and Count VIII (Negligence).

  Ms. Greenbank's Motion for Reconsideration [Dkt. 64] is **denied.** Her Objection

to the Magistrate Judge's January 2, 2020 Order [Dkt. 86] is **overruled.**

      IT IS SO ORDERED.

Date:      3/31/2020

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Robert L. Burkart
ZIEMER STAYMAN WEITZEL & SHOULDERS
rburkart@zsws.com

Christopher S. Burnside
FROST BROWN TODD LLC
cburnside@fbtlaw.com

Kevin Nathaniel Fowler
FROST BROWN TODD LLC (Louisville)
nfowler@fbtlaw.com

Justin S. Fowles
FROST BROWN TODD LLC
jfowles@fbtlaw.com

Christopher Glade Johnson
FROST BROWN TODD LLC
cjohnson@fbtlaw.com

Patrick A. Shoulders
ZIEMER STAYMAN WEITZEL & SHOULDERS
pshoulders@zsws.com

Clifford R. Whitehead
ZIEMER STAYMAN WEITZEL & SHOULDERS LLP
cwhitehead@zsws.com