UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| JULIE GREENBANK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:18-cv-00239-SEB-MPB |
| | ) | |
| GREAT AMERICAN ASSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON PENDING MOTIONS

On November 26, 2018, Plaintiff Julie Greenbank brought suit against Great American Assurance Company ("Great American") [Dkt. 1-3]. On December 20, 2018, following the removal of the case to federal court, pursuant to 28 U.S.C. § 1332, Ms. Greenbank filed her first Amended Complaint alleging eight causes of action: breach of contract (Count I); bad faith (Count II); theft (Count III); statutory conversion (Count IV); criminal mischief (Count V); statutory, common law, and constructive fraud (Count VI); and common law conversion (Count VII), and negligence (VIII). [Dkt. 10].

On March 31, 2020, we issued an order on Great American's Motion for Summary Judgment, filed on July 19, 2019, [Dkt. 51], and Ms. Greenbank's Cross-Motion for Partial Summary Judgment, filed on December 10, 2019. [Dkt. 79]. We denied Ms. Greenbank's Cross-Motion, and we granted in part and denied in part Great American's motion.

Now before the Court is Great American's Second Motion for Summary Judgment, seeking summary judgment on the remaining claims against it. Also before the Court is

Ms. Greenbank's Motion for Reconsideration of our summary judgment order. For the reasons set forth herein, Great American's motion is **granted**. Ms. Greenbank's Motion for Reconsideration is **denied.**[1]

## I.   Background

### A.   Factual Background[2]

The following facts are undisputed, unless so noted.

---

[1] Ms. Greenbank has also moved for leave to submit additional evidence. [Dkt. 227]. This motion is **denied** on the grounds that it is untimely and, in any event, the proposed supplemental evidence would have no impact on our analysis.

[2] A jury trial was scheduled to commence in this matter on August 17, 2020; however, in light of restrictions imposed because of the COVID-19 Pandemic, the jury trial was vacated. The court nonetheless held a final pretrial conference on August 4, 2021, and ruled on various motions in limine. Among the various pre-trial motions was Great American's request, brought pursuant to Federal of Civil Procedure 56(g), for an order restricting Ms. Greenbank from denying various material facts that were undisputed at summary judgment. [Dkt 148]. Accompanying its motion was a list of facts that Great American contended had been established and/or admitted at summary judgment. We granted in part Great American's motion. "In a nutshell," we explained, "regarding claims not resolved on summary judgment, Rule 56(g) authorizes the court to deem established any additional material facts that are not genuinely in dispute in the case." [Dkt. 196, at 2]. We also noted, "[W]e can swiftly dismiss Ms. Greenbank's generalized contention that, despite the various summary judgment determinations, there are *no* undisputed material facts that should be deemed established at trial." [*Id.*] "Clearly, a number of the claims raised in this litigation and resolved on summary judgment were based on our determination that the underlying facts were material, were supported by competent, uncontroverted record evidence, and were not genuinely in dispute." [*Id.*]. We thus treat those facts as established for purpose of this order. In addition, we agreed with "Great American that relitigating and rehashing settled and admitted facts, whether underlying the decided or the so far undecided issues, would serve to needlessly complicate and confuse and prolong the trial proceedings." [*Id.* at 3–5]. Accordingly, we granted Great American's motion to the extent that the undisputed and admitted material facts would be deemed established in this litigation, though we expressly noted that we would not "include any inferences flowing therefrom," nor would we incorporate Great American's arguments imbedded in its factual recitations [*Id.* at 6]. We further directed Ms. Greenbank to respond to the facts proposed by Great American's motion, indicating whether she acceded to or objected to the stipulations. As to any objections to facts which she interposed on the grounds that they remain unresolved, we ordered her to "identify with specificity the basis for her objection." [*Id.*]. We review those objections herein as relevant and necessary.

In September 2017, Ms. Greenbank purchased an American Saddlebred gelding horse named Awesome at This (barn name "Thomas") for $500,000. At the time of purchase, Thomas was a champion, competitive show horse weighing 959 pounds. Ms. Greenbank arranged for Thomas to be boarded and trained at Cedarwood Farms in Evansville, Indiana, which is owned and operated by Chuck Herbert. Mr. Herbert began training Thomas in December 2017.

Ms. Greenbank and Great American executed a mortality insurance policy (the "Policy") with a major medical endorsement, effective September 28, 2017 through September 28, 2018, providing financial protections for Thomas. The Policy's mortality coverage was for Thomas's full purchase price of $500,000. The initial one-year term was set to expire on September 29, 2018, but Ms. Greenbank also purchased a "Guaranteed Renewal Endorsement," which provided renewal coverage under the Policy year-to-year thereafter. [Am. Compl. at ¶¶ 19-20]. The "death or authorized humane destruction" of Thomas qualified as a covered loss under the Policy so long as Ms. Greenbank complied with various conditions precedent.

First, Section VI(F) of the Policy, in relevant part, provides:

It is a condition precedent of any liability by us under this policy that, in the event of any accident, injury, illness, lameness condition or lameness injury, disease, or physical disability of any kind of or to [Thomas], you do each and every one of the following or have it done by another:

1. [omitted]
2. Give immediate notice to us of the accident, injury, illness, lameness condition, or lameness injury, disease, or physical disability of any kind. Such notice should be given by telephone to us at our **24 HOUR EQUINE OPERATIONS CALL NUMBER: 1-800-331-0211,** and must include (a) a description of the accident, injury, illness, lameness condition or lameness injury, disease, or physical disability and (b) the

3

    name and contact information of the qualified veterinarian caring for the "horse"

3. [omitted]
4. Allow us to examine, and if we so require, to assume control over the treatment of the "horse" by a "qualified veterinarian" of our choice, at our expense, and allow the "horse" to be removed for such treatment[.]
5. [omitted]

The Policy further provided:

**PLEASE NOTE**

IMMEDIATE NOTICE OF ANY OCCURRENCE WHICH COULD RESULT IN A CLAIM INVOLVING ANY ANIMAL INSURED UNDER THIS POLICY MUST BE GIVEN BY YOU, YOUR REPRESENTATIVE, OR OTHER PERSONS WHO HAVE CARE, CUSTODY AND CONTROL OF SUCH ANIMAL. NOTICE IS TO BE GIVEN TO GREAT AMERICAN INSURANCE - EQUINE OPERATIONS CALL 24 HOURS 1-800-331-0211. PLEASE ADVISE POLICY NUMBER, NAME OF INSURED, AND ANIMAL INVOLVED, ALSO INCLUDE A TELEPHONE NUMBER TO CONTACT WHERE THE ANIMAL IS LOCATED. GENERAL CONDITION 6 OF THE POLICY STIPULATES THE REQUIREMENTS FOR TREATMENT OF SICKNESS OR INJURY TO AN INSURED ANIMAL. THESE STIPULATIONS MUST BE ADHERED TO IMMEDIATELY WHEN THE CONDITION OR INJURY IS OBSERVED OR KNOWN. IT IS ESSENTIAL TO CONFORM TO ALL THE ABOVE REQUIREMENTS SINCE FAILURE TO DO SO WILL INVALIDATE ANY CLAIM UNDER THIS POLICY.

B. <u>Thomas's Declining Health and Great American's Intervention</u>

Concerns about Thomas's health first arose in February 2018, when Mr. Herbert, Thomas's trainer, sought an assessment from Dr. Raymond Stone, a licensed veterinarian with an equine practice. On February 12, 2018, Dr. Stone treated Thomas for colic before diagnosing him with bilateral pleural pneumonia on February 15, 2018. Dr. Stone determined that Thomas's pneumonia was bacterial and thus began treating him with "heavy antibiotics." [Dkt. 51-2, at 7]. While Dr. Stone communicated primarily with Mr.

Herbert, Ms. Greenbank was aware of Thomas's pneumonia at the time of his diagnosis on February 15, 2018.

Thomas's pneumonia continued into March 2018. On March 6, 2018, Mr. Herbert reported to Ms. Greenbank that Thomas had a "lot of congestion . . . in his trachea." In late-March 2018, Dr. Stone determined that Thomas's pneumonia was "systemic" and that Thomas was "very sick." Ms. Greenbank concedes that, by late March, Thomas was "pretty darn sick" and in "critical condition." [Dkt. 51-2, at 8].

Dr. Stone suspected that Thomas was suffering from other ailments at this time as well.  He testified that both he and Mr. Herbert, due to the exudate and odor of Thomas's cough, were concerned that Thomas had a lung abscess. Nonetheless, Dr. Stone believed that "it eventually resolved because the drainage stopped." [Dkt. 80, at 11]. Dr. Stone further noted that by the end of March 2018, Thomas had lost 200 to 250 pounds and had developed cellulitis in all four legs. Thomas had also developed uveitis in his eye. On March 26, 2018, Ms. Greenbank inquired of Mr. Herbert whether she should "file" Thomas's medical bills with the insurance company, to which he responded in the affirmative.

In April 2018, Dr. Stone noted that Thomas was responding positively to these treatments. On April 10, 2018, Dr. Stone examined Thomas and reported that his lungs and right eye were now clear, but his left eye remained a little cloudy. On April 13, 2018, Dr. Stone decided that Thomas's pneumonia medication could be decreased considering his improving condition. Dr. Stone continued to decrease Thomas's medication before

deciding to ween him off it completely on April 21, 2018.  Mr. Herbert agreed that Thomas's appetite finally was increasing.

Not until April 26, 2018 did Ms. Greenbank report to Great American that Thomas was battling pneumonia. Charlotte Bloxsom, a senior claims adjuster at Great American, was assigned to Ms. Greenbank's claim. That same day, Ms. Greenbank submitted Dr. Stone's bills to Great American for reimbursement. Ms. Bloxsom immediately opened a claim file for Thomas and began the investigatory process into Thomas's pneumonia.

On May 3, 2018, Ms. Greenbank informed Ms. Bloxsom that Thomas had recovered from his pneumonia and was back in training. However, Ms. Greenbank later confirmed in her deposition that Thomas "had been sick continuously from February until June." [Dkt. 51-2, at 10]. Additionally, at no time in her conversations with Ms. Bloxsom did Ms. Greenbank inform her of Thomas's eye issues, leg issues, or weight lost.

On May 7, 2018, Thomas's condition appeared to be in decline. His limp had worsened, and his cough had returned. Mr. Herbert informed Dr. Stone that he "didn't think Thomas was going to make it."[3] [Dkt. 51-2, at 11]. Ms. Greenbank testified that Thomas's limp was so severe that she was afraid to have him walk on it. However, she did not discuss any of these new developments with Ms. Bloxsom or any other representative of Great American.

---

[3] Plaintiff now for the first time attempts to dispute this fact by directing the Court to Mr. Herbert's deposition testimony offering clarification on this statement. Ms. Greenbank did not attempt to dispute this fact at summary judgment, and there is no dispute that Mr. Herbert did, in fact, inform Dr. Stone in June that he did not think Thomas was going to make it. Ms. Greenbank's objection to this established fact is thus overruled.

By May 10, 2018, Thomas's health again seemed to be improving, says Ms. Greenbank. Mr. Herbert reported that Thomas was "bright and eating great." Dr. Stone's examination on May 10, 2018, confirmed that Thomas was walking "ok," had a good appetite, and his trachea was clear. According to Dr. Stone's assessment, "Everything appears good, concern is weight loss, but horse finally eating extremely well to rebuild muscle[.]" Following this examination, neither Ms. Greenbank nor Mr. Herbert sought further veterinary assistance from Dr. Stone until June 5, 2018.

Thereafter, Thomas's health apparently remained generally steady until it drastically worsened. On May 14, 2018, an employee at Cedarwood informed Ms. Greenbank that Thomas was "having a good day," and "[i]f he's not walking, he's grazing!!" [Dkt. 80, at 13]. At the end of May 2018, according to Ms. Greenbank, Thomas did not have any trouble walking or standing, and Mr. Herbert thought it "look[ed] like he might be gaining weight." On June 1, 2018, an employee texted Ms. Greenbank that "Thomas walked great this morning." [*Id.*].

Sadly, these victories proved to be short-lived for Thomas. On June 5, 2018, Mr. Herbert, having grown concerned over Thomas's weight loss, contacted Dr. Stone for a consultation. Dr. Stone examined Thomas on June 5 and 7, 2018, and concluded that Thomas's pneumonia/lung infection had recurred.[4] Around this same time, Thomas's ability to get up and down was compromised. On June 8, 2018, Dr. Stone contacted Ms. Bloxsom and informed her that Thomas's condition had deteriorated and that he

---

[4] The parties dispute whether the pneumonia recurred or was chronic.

"probably" needed to be euthanized. Following receipt of this information, Great American retained its own veterinarian, Dr. Nathan Slovis, to provide consultation and treatment for Thomas.

Dr. Slovis initially recommended that Thomas be transported to a local clinic for treatment as soon as practicable before concluding that it was in Thomas's best interest to be shipped to his facility in Lexington, Kentucky. On June 8, 2018, Mr. Herbert transported Thomas to Hagyard Equine Medical Institute ("Hagyard") so that he could be treated by Dr. Slovis and his team. It was at this time that Great American assumed control over the treatment of Thomas pursuant to the Policy provision authorizing that action.

Dr. Kathy MacGillivray was the doctor on call at Hagyard when Thomas arrived and would eventually become Thomas's primary veterinarian while at Hagyard. She evaluated Thomas and determined that he was suffering from a deep lung abscess that had not been visible via Dr. Stone's medical equipment, necessitating a large amount of pus to be drained from Thomas's lungs. Thomas was also diagnosed with laminitis—an inflammation of tissue inside a horse's hoof. Ms. Greenbank concedes that Thomas was found to be emaciated as well, warranting a body score of 1, the lowest possible score assignable to him. Thomas's health condition upon arrival at Hagyard alarmed Dr. MacGillivray, who believed Thomas should have been referred to specialists months earlier. Dr. Slovis was also concerned about the lack of treatment Thomas had received while he was in Ms. Greenbank's care. Dr. MacGillivray refrained from recommending euthanization because Thomas had not yet received appropriate health care. Specifically,

8

she viewed the true nature of Thomas's health as unclear based on what seemed to be a lack of proper medical treatment. She thus preferred to attempt to stabilize Thomas before issuing a decision on euthanization.

On June 11, 2018, Dr. Bryan Fraley, another veterinarian at Hagyard, recommended performing a tenotomy on Thomas, which involved cutting the tendon in his hind leg. Ms. Greenbank believed the procedure would render his future athletic career "unlikely," though it would preserve his life as a pasture horse. Ms. Greenbank objected to the procedure, preferring that more conservative treatment options be explored to preserve his future athleticism as a show horse. Though Great American chose not to pursue more conservative treatment options, it denies having refused to consider them. Dr. Fraley testified that there were no more conservative options that would have been viable in saving Thomas's life. Great American directed that the tenotomy be performed on June 11, 2018.

Since his transport to Hagyard, Great American has paid all his medical bills and expenses incurred for his treatment.

C. Great American Provides Coverage for Certain Medical Expenses

Prior to Great American exerting control over Thomas's care, on April 26, 2018, Ms. Greenbank submitted Dr. Stone's bills to Great American and requested coverage for various medical expenses she had incurred pursuant to the Policy's Major Medical Endorsement, which provided up to $10,000 in coverage for "reasonable and customary veterinary fees" incurred for "surgical and medical treatment" or "diagnostic testing" provided by a qualified veterinarian. Section VIII(A) of the Major Medical Endorsement

defines "reasonable and customary veterinary fees" as: "[R]easonable fees for a necessary veterinary service or product, within the range of the usual fees for the same or similar service or product charged by most veterinarians within the community where the service or product is supplied."

On June 27, 2018, Great American communicated to Ms. Greenbank that it would provide coverage for Dr. Stone's veterinarian bills in the amount of $8219.74; however, it denied coverage for certain expenses, including "Farm Calls/Travel Charges/Horse Transportation Fees," on the grounds that costs associated with "veterinarian call charges, veterinarian travel, [and] horse transportation" are expressly excluded under Section VI.F of the endorsement. Great American also denied coverage for the medications Equipoise, Marquis, and Gastrogard. As to the first two medications, Great American explained to Ms. Greenbank that these medications are not utilized to treat pneumonia, which, at the time, was the only ailment Thomas was suffering from that Ms. Greenbank had reported to Great American. In addition, Gastrogard is expressly excluded as a covered medication except where gastric ulcers have been diagnosed through a gastroscopy, which had not occurred. Accordingly, Great American denied coverage for costs totaling $4782.00. Because Great American had paid out over 80% of the $10,000 endorsement, the maximum amount that Ms. Greenbank could recover for this alleged wrongful denial of coverage is $1780.26.

### D. Termination of the Policy

The Policy expired by its terms on September 28, 2018. The Policy included a Guaranteed Renewal Endorsement, which Ms. Greenbank sought to invoke. To do so, she

paid Great American the annual premium amount of $14,725.00. On September 20, 2019, however, Great American issued a reservation of rights letter in which it declined to renew the Policy based on Ms. Greenbank's alleged failure to fulfill various conditions precedents entitling her to the renewal. Great American acknowledged in its reservation of rights letter that it was required under Indiana law to provide Ms. Greenbank with forty-five days' notice of its decision not to renew the Policy, which it failed to do. To remedy this error and "to afford [her] the opportunity to find replacement coverage," Great American issued a "short-term policy" to extend Ms. Greenbank's coverage for an additional sixty days following the termination of the Policy. [Dkt. 206-7, Exh. F]. As Great American's Vice President testified, the short-term policy (sometimes referred to in Great American's letter as a "short-term renewal policy") was issued to provide Ms. Greenbank "an additional 60-days coverage for any condition that was going to manifest in those 60-days." [Dkt. 213-1, Exh. G, p. 140].

Included with Great American's letter was a copy of the short-term renewal policy, which expressly provided mortality coverage arising from any "accident, injury, lameness condition or lameness injury, or physical disability" that was sustained or occurred, or "any illness or disease contracted or occurred," [Dkt. 214-7, Exh. GG] during the short-term policy period. Great American reimbursed Ms. Greenbank's premium, less the amount ($1943.00) required for the short-term renewal.

By this time, Ms. Greenbank had already retained counsel to represent her in the eventual lawsuit against Great American. Throughout the period between Great American's issuance of the short-term renewal and the initiation of this litigation, Great

11

American's counsel was in communication with Ms. Greenbank's counsel. At no time in these communications did Ms. Greenbank's counsel ever indicate to Great American that Ms. Greenbank objected to the issuance of the policy or the retention of the partial premium. In addition, when Ms. Greenbank discussed the renewal terms of the short-term policy with her insurance agent, Ms. Erin Mason,[5] Ms. Greenbank communicated that she understood these terms. She did not request cancellation of the renewal policy or request a refund of the premium. Ms. Mason, following her communications with Ms. Greenbank, was of the impression that Ms. Greenbank had accepted Great American's issuance of the short-term renewal without objection. In sum, prior to the initiation of this litigation on November 26, 2018, (which commenced one day prior to the expiration of the short-term renewal policy), Ms. Greenbank never articulated any objection to the issuance of the short-term renewal policy nor demand the return of the partial premium in the sum of $1943.

E. <u>Procedural Background</u>

On March 31, 2020, we granted Great American's summary judgment motion on the following claims:

- Breach of contract (Count I) alleging that Great American improperly denied Ms. Greenbank's claim for mortality coverage;[6]

---

[5] Ms. Mason is employed with Independent Equine Agents, an insurance agency that "specializes in placing insurance for individuals who own horses." This company specifically works with equine insurance companies providing mortality coverage.

[6] In short, this holding was based on our finding that no covered loss occurred given that a covered loss arises only in the event of Thomas's death. "Thomas is not dead, and further, Great American has never mistakenly believed he was dead," we wrote. [Dkt. 123, at 32]. We also dismissed Ms. Greenbank's unsubstantiated accusations that Great American had unreasonably prevented Thomas's euthanization. This argument was anchored to her apparent belief that Great American should have considered Thomas's "insured use as a show horse, his future athleticism,

- Bad faith (Count II) based on the denial of mortality coverage;

- Theft (Count III); and

- Statutory Conversion (Count IV) and Tortious Conversion (Count VII) relating to Great American's unauthorized control of Thomas following the termination of the Policy.[7]

We denied Ms. Greenbank's motion for summary judgment with respect to Count I, as well as Great American's motion with respect to criminal mischief (Count V), fraud (Count VI), negligence (Count VIII), and statutory and tortious conversion (Counts IV and VII) to the extent these claims related to the alleged conversion of Ms. Greenbank's funds. Claims unaddressed by the parties at summary judgment included Ms. Greenbank's additional breach of contract (and accompanying bad faith) claims, including those related to Great American's denial of medical expenses, Great American's approval of a purportedly controversial medical procedure, and Great American's refusal to renew Ms. Greenbank's Policy.  Accordingly, the undecided claims include:

- Breach of contract claims relating to Great American's denial of medical expenses, Great American's approval of the tenotomy, and Great American's refusal to renew

---

[and her] insured investment" in its determination of whether to euthanize Thomas. [*Id.* at 33]. But "[n]othing within the Policy mandated that Great American consider Thomas's value as a show horse in its decision-making process," given that the Policy plainly did not provide "loss of use" coverage, that is, coverage in the event Thomas was unable to perform as a show horse. [*Id.* at 37–38]. Because Great American followed the recommendations and guidance of two qualified veterinarians when rendering care to Thomas, we found Ms. Greenbank's averment that this care was somehow unreasonable to be wholly unsupported by the factual record presented.

[7] Summary judgment was granted to Great American on Ms. Greenbank's allegations that it had committed theft and conversion by virtue of its continued retention of Thomas on the grounds that there was no evidence to show that Great American's control or possession of Thomas was unauthorized, an essential element of these claims.

Ms. Greenbank's Policy (Count I) as well as the accompanying bad faith claims (Count II)

- Criminal Mischief (Count V)

- Fraud (Count VI)

- Negligence (Count VIII)

- Statutory and Tortious Conversion as it relates to the alleged conversion of Ms. Greenbank's funds (Counts IV and VII)

In the final pretrial conference held on August 4, 2020, we issued numerous rulings relating to Ms. Greenbank's remaining claims, including our decisions and conclusions that:

- Ms. Greenbank may not rely on any theory of Thomas's alleged "loss of use" or "lost athleticism" to prove that Great American breached the Policy by approving the tenotomy;

- Indiana law does not permit a claim for insurance bad faith based on a refusal to renew an insurance policy;

- Ms. Greenbank would be precluded from offering expert evidence at trial because of her failure to properly designate any experts; and

## II.    Ms. Greenbank's Motion for Reconsideration

Ms. Greenbank has moved to reconsider our prior decisions, as follows: (a) our conclusion, articulated at the August 24, 2020 final pretrial conference, that Indiana law does not permit a bad faith claim for the refusal to honor a policy renewal,(2) our conclusion, determined at summary judgment, that Great American did not concede that a covered loss had occurred when it requested that Ms. Greenbank participate in Examinations Under Oath, and (3) our summary judgment holding that the Policy did not provide coverage for Thomas's use as a show horse.

A motion for reconsideration "serves the limited function of correcting manifest errors of law or fact or presenting newly discovered evidence." *Thomas v. Johnston*, 215 F.3d 1330 (7th Cir. 2000). The Seventh Circuit has defined the proper role of motions for reconsideration as follows:

> A motion for reconsideration performs a valuable function where the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. A further basis for a motion to reconsider would be a controlling or significant change in the law or facts since the submission of the issue to the Court.

*Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (*quoted in Elder Care Providers of Indiana, Inc. v. Home Instead, Inc.*, No. 1:14-CV-01894-SEB-MJD, 2017 WL 4287540, at *1 (S.D. Ind. Sept. 26, 2017)). A motion to reconsider "is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion." It is within the sound discretion of the district court whether to grant a motion for reconsideration. *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 955 (7th Cir. 2013).

We will not tarry in denying Ms. Greenbank's Motion for Reconsideration. She had not identified any manifest errors in law or changes thereto, nor has she identified any newly discovered evidence; (it is common, we have observed, for Ms. Greenbank to wholly ignore governing legal standards of review). Instead, she merely rehashes previously rejected arguments, volleys legal assertions without any supporting authorities, misstates the reasoning underlying our rulings, and attempts to relitigate decided issues. Moreover, her Motion for Reconsideration is patently untimely, having

15

been filed nearly a year after our summary judgment order and seven months after the

final pretrial conference. FED. R. CIV. P. 59(E); *Jones v. Wells Fargo Bank, N.A.*, No.

1:18-CV-125-TLS, 2018 WL 6303683, at *2 (N.D. Ind. Dec. 3, 2018); *see also Williams*

*v. Illinois*, 737 F.3d 473, 475 (7th Cir. 2013).

Imbedded in Ms. Greenbank's Motion for Reconsideration is an alternative request

to certify the following questions to the Indiana Supreme Court:

1. Where an insurer's intended action conflicts with an insured's desired action, does the insurer's duty of good faith require it to follow an insured's desired action?

2. Is an insurer who exercises a policy right to make decisions for the insured's property obligated to take into account the insured use of the property and the policy purpose when making those decisions?

3. Does an insurer exercising a policy right to take control of an insured's property have a legal duty to return the property to the insured after the policy terminates?

Indiana Rule of Appellate Procedure 64 provides:

The United States Supreme Court, any federal circuit court of appeals, or any federal district court may certify a question of Indiana law to the Supreme Court when it appears to the federal court that a proceeding presents an issue of state law that is determinative of the case and on which there is no clear controlling Indiana precedent.

Certification may be appropriate when a case "concerns a matter of

vital public concern, where the issue will likely recur in other cases, where resolution of

the question to be certified is outcome determinative of the case, and where the state

supreme court has yet to have an opportunity to illuminate a clear path on the issue."

*State Farm Mut. Auto. Ins. Co. v. Pate*, 275 F.3d 666, 671 (7th Cir. 2001).

We agree with Defendant that these issues are not appropriate for certification. Though there may not be an authoritative case which squarely addresses facts such as those presented here, as Ms. Greenbank contends, there is ample guidance available on the questions at the center of this case, including significant guidance on contract interpretation, an insurer's duty of good faith, and the various state law questions at issue in this litigation. In addition, Ms. Greenback does not counter Great American's point that the identified issues are obviously not case determinative and therefore not appropriate for certification. Finally, Ms. Greenbank's belated request on these issues renders certification inappropriate. *St. Paul Fire & Marine Insurance Company v. City of Kokomo*, No. 1:13-cv-01573, 2015 WL 7573227, *9 (S.D. Ind. Nov. 25, 2015) (failing to propose certification prior to summary judgment rendered the request "untimely"). That Ms. Greenbank only now attempts to categorize these questions as "novel" and of "public concern" signals that she believes them to be as much now only because she has lost on them in our court. *Id.*

For these reasons, Ms. Greenbank's Motion for Reconsideration is **denied**, and her imbedded Motion for Certification is also **denied.**

## III.    Great American's Motion for Summary Judgment

### A. Standard of Review

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the

nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

Nonetheless, it is well-established that "conclusory statements, not grounded in specific facts, are not sufficient to avoid summary judgment." *See Lucas v. Chi. Transit Auth.,* 367 F.3d 714, 726 (7th Cir. 2004). "Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of truth of the matter asserted." *Id.* (*quoting Drake v. Minn. Min. & Mfg. Co*., 134 F.3d 878, 887 (7th Cir. 1998) (*citations omitted*.); *See also Siegel v. Shell Oil Co*., 612 F.3d 932, 937 (7th Cir. 2010) ("Summary judgment is the put up or shut up moment in a lawsuit. Once a party has made a properly-supported motion for summary judgment, the nonmoving party may not simply rest upon the pleadings but must instead submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial . . . The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive a summary judgment motion[.]") (internal quotations and citations omitted).

Where the movant seeks judgment on a claim on which the nonmovant bears the burden of proof, as Great American does here, the movant is entitled to judgment as a matter of law if it can point to a failure of proof in the record such that no reasonable jury

could find in the nonmovant's favor on one or more elements of his claims. *Celotex Corp.,* 477 U.S. at 322-23.

B. <u>Analysis</u>

1. *Great American Is Entitled to Summary Judgment on Ms. Greenbank's Remaining Breach of Contract Claims*

Unaddressed in the first round of summary judgment was whether Great American breached its contract with Ms. Greenbank when it: a) approved the performance of a tenotomy on Thomas, b) refused to honor the Guaranteed Renewal Endorsement, c) denied coverage under the Major Medical Endorsement in the sum of $1780.53.

To prevail on each of these claims, Ms. Greenbank must show: (1) the existence of a valid contract; (2) Great American's breach of the contract; and (3) damages. *Roche Diagnostics Operations, Inc. v. Marsh Supermarkets, LLC*, 987 N.E.2d 72, 85 (Ind. Ct. App. 2013).[8] There is no dispute as to the validity of the contract at issue, and so we focus our inquiry on whether Great American has breached its duties under the Policy, and whether any such breaches caused Ms. Greenbank damages.

We address each of Ms. Greenbank's remaining breach of contract claims in turn below.

a. *Great American Did Not Commit a Breach of Contract When It Authorized the Tenotomy*

Ms. Greenbank alleges that Great American breached its duties under the contract when it authorized the performance of the tenotomy. This claim is based entirely on Ms.

---

[8] The parties agree that Indiana law governs here.

19

Greenbank's apparent belief that the Policy required Great American to consider
Thomas's value and use as a show horse when making decisions related to his care. She
maintains that Great American violated the Policy when it authorized this procedure
which would "render[] him nothing but a pasture horse," in her words. [Dkt. 80, at 50].

Ms. Greenbank's theory is foreclosed by our prior Summary Judgment rulings,
where we addressed and rejected each of the arguments that she continues to advance
here. We need not trot through each of these arguments again, other than to reference and
incorporate them here:

> We move next to address Great American's claim that Ms. Greenbank has
> misrepresented the meaning of Thomas's "insured use," and, more specifically,
> that Ms. Greenbank improperly argues that Great American failed to consider this
> "insured use" when making decisions for Thomas's health.
>
> Ms. Greenbank's repeated references to Thomas's "insured use" refers to another
> provision in the Policy that provides mortality coverage so long as Thomas had
> been used only for his specified permitted purpose, which was that of a show
> horse. [Dkt. 1-3, Sec. VI(C)]. As Great American explains, this provision simply
> means that Ms. Greenbank would not have been entitled to coverage if Thomas
> had been used in a different category of activity without first receiving Great
> American's authorization. It does not, as Ms. Greenbank appears to believe,
> provide coverage for Thomas's use only as a show horse. Importantly, says Great
> American, Ms. Greenbank did not even have coverage for "loss of use," that is, the
> Policy did not provide coverage in the event Thomas was unable to perform as a
> show horse. Thus, argues Great American, it had no duty to consider "Thomas's
> future athleticism" or Ms. Greenbank's "investment" in Thomas as a show horse,
> when reaching its decisions for Thomas's healthcare. [Dkt. 95, at 17, Dkt. 95-2, at
> 151-52, 195].
>
> Ms. Greenbank offers minimal rebuttal on this point. She does not dispute Great
> American's construction of the Policy language . . . Nor does she offer any other
> explanation as to why Great American would have been required to consider
> Thomas's "use" when deciding his course of treatment pursuant to this provision
> absent coverage for "loss of use."
>
> [. . . ]

20

> Ms. Greenbank's  minimal response to these arguments and Policy provisions leaves her without a claim against Great American on this basis.  Nothing within the Policy mandated that Great American consider Thomas's value as a show horse in its decision-making process with regard to his care.

[Dkt. 123, 36–38]. Based on these findings, we noted: "Though briefly touched upon, but not directly at issue in the parties' summary judgment briefing is the question of whether Great American committed a breach of contract by approving the tenectomy. *We encourage Ms. Greenbank to consider the viability of this claim before pressing forward with it in light of our ruling*[.]" (emphasis added). [*Id.* at n. 20].

We reiterated our concerns regarding the viability of this claim during the final pretrial conference and granted Great American's motion in limine seeking to exclude from trial any arguments relating to an alleged duty to consider Thomas's value as a show horse when making decisions related to his health. We explained:

> So I'm going to grant this motion in limine because it's the reasonable and logical outgrowth of the summary judgment ruling. Our prior ruling was not limited only to mortality coverage. So there was no contract provision for this kind of loss. The plaintiff has not shown or identified any reason why Great American was contractually required to consider Thomas's use as a show horse when it provided medical care to him. As I've said before, and I have previously concluded, nothing within the policy mandated that Great American consider Thomas's value as a show horse in its decision-making process with regard to its care. Therefore, this would not be relevant evidence to put before a jury with respect to the plaintiff's expectations of loss of use  and loss of future athleticism since there's no duty that arises under the contract.

[Dkt. 199, 30:4–18].

Despite these admonitions, Mr. Greenbank has nonetheless refused to accede to our rulings and has instead dedicated her briefing to unsubstantiated factual and legal theories, *all* of which have previously been rejected. We will not review these arguments

again herein. We adopt our early analyses in holding that Ms. Greenbank's theory that Great American breached its contractual duties when authorizing the performance of the tenotomy fails. Summary judgment shall enter in favor of Great American on this claim.

Ms. Greenbank also maintains that Great American acted in bad faith in approving the tenotomy. It follows, however, that there can be no viable claim for bad faith when no breach has occurred. *See Kartman v. State Farm Mut. Auto. Ins. Co*., 634 F.3d 883, 890, 2011 WL 488879 (7th Cir. 2011); *Shifrin v. Liberty Mut. Ins*., 991 F. Supp. 2d 1022, 1044, 2014 WL 87877 (S.D. Ind. 2014). Accordingly, summary judgment is granted in favor of Great American on this claim as well.

> b. *Great American Did Not Commit a Breach of Contract When It Refused to Honor the Guaranteed Renewal Endorsement*

Great American offers several arguments which undermine Ms. Greenbank's theory that it committed a breach of contract when it refused to renew her Policy despite the existence of the Guaranteed Renewal Endorsement. For example, Great American contends that Ms. Green failed to satisfy various conditions precedents for coverage, to wit, failing to provide Thomas with proper care and attention, failing to provide Great American with immediate notice of his various ailments, and misrepresenting the nature of Thomas's true condition. In any event, Great American explains, Ms. Greenbank has not suffered any damages from the nonrenewal, and thus no liability exists.

We need not determine whether Ms. Greenbank satisfied her duties under the Policy which entitled her to the benefits of the Guaranteed Renewal Endorsement; we are in complete agreement with Great American that this breach of contract theory fails on

the grounds that she cannot establish an essential legal element of this claim, that is, damages.

As Great American explains, Ms. Greenbank has advanced no theory nor evidence reflecting any damages which she has suffered by way of Great American's alleged breach. She does not allege that any claim arose in the period in which the renewal theoretically would have been in effect (September 2018 through September 2019) for which she was unable to receive coverage (nor could she, since Great American was caring for Thomas during this period and paying for all costs associated with that care). There are simply *no* identifiable damages Ms. Greenbank suffered by virtue of Great American's "breach" of the Guaranteed Renewal Endorsement. Indeed, our court recognized the deficiencies of Ms. Greenbank's theory again during the pretrial conference:

> The Court: So assuming all you say is true, what damage do you attach to that?
>
> Counsel: We attach the loss of that additional policy extension.
>
> The Court: Wait, I'm asking you for a dollar sum that you attach to Great American's exercise of its rights under the contract not to renew. Let's say they did [breach the contract] . . . It doesn't change the fact that you have to prove damages under the contract for the breach of contract, and that, Counsel, is what I'm struggling to try to understand, where those damages come from. What number reflects the loss, the harm?
>
> Counsel: I think we'd say it would be the same $500,000 mortality provision which they -- coverage which they took away.
>
> The Court: What was that? You attach 500,000 --
>
> Counsel: So they --

The Court: Wait a minute. You attach 500,000 to the breach of contract claim having to do with the nonrenewal of the policy?

Counsel: No, but I think that was the ultimate -- their ultimate goal was to reduce that risk. I think in terms of damages, it's just the loss of that policy extension, and that shows part of the –

The Court: What's the value of that? You're coming up with damages. What are you going to put on the white board for the jury, Mr. Burkhart?

Counsel: Well, I mean, I think if you had to put it up, it would be what is the cost of that lost coverage.

The Court: What is it? What is it? What is the value of that lost -- I can figure out the value of the loss of the breach for the denial of medical expenses. It's 1,780. Have you not figured this out? You? If you don't have a number, just say that.

Counsel: Well, it think it would be, at a minimum, it would be 1,900 for the renewal policy.

[Dkt. 199, pp. 22–24].

Counsel's averments at the conference illuminate the vapid nature of this breach of contract claim and Ms. Greenbank's failure to identify even a theory of damages, let alone evidence of damages.[9]

In any event, Ms. Greenbank's briefing on this issue fails *entirely* to respond to Great American's contention that she has not suffered any damages on this alleged breach of contract. Accordingly, any arguments she may have had are now deemed waived. *G&S*

---

[9] Any theory from counsel at the final pretrial conference that her damages from this breach included the premium she paid for the short-term renewal is nonsensical. Ms. Greenbank cannot seriously argue that she was harmed by the refusal to extend her coverage for the upcoming year in the form of the money she paid to receive short-term coverage. That makes no sense. Any logical force this theory could have had is lost by the fact that it appears nowhere in Ms. Greenbank's briefing on the pending motion. In addition, the recovery of those premiums forms the basis of her conversion claims, which we also find devoid of merit.

24

*Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012). Her continued efforts to lob unsubstantiated and conclusory arguments, which skirt the relevant facts and legal issues, are inappropriate, unavailing, and undeserving of our attention. Having failed to rebut Great American's contention or offer an iota of evidence of damages suffered from this alleged breach, we hold that Great American is entitled to summary judgment on this claim against it.

We reiterate, as set forth in our pretrial findings, there is no viable claim for bad faith based on this alleged breach. Bad faith occurs when an insurer engages in: "(1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in payment; (3) deceiving the insured; and (4) exercising an unfair advantage to pressure an insured into settlement of his claim." *Knowledge A-Z, Inc. v. Sentry Ins.*, 857 N.E.2d 411, 422 (Ind. Ct. App. 2006).  Ms. Greenbank does not contend that any such bad faith actions occurred here with respect to Great American's decision not to honor the Guaranteed Renewal Endorsement. Ms. Greenbank's continued protests that Indiana law encompasses her bad faith theory are simply not supported by *any* legal authorities.

> c. *Great American Did Not Commit a Breach of Contract When It Denied Certain Medical Expenses*

Finally, Ms. Greenbank's complaint alleges that Great American breached its contractual duties to her when it failed to provide coverage for certain medical expenses under the Major Medical Endorsement. She contends that she is entitled to $1780.26 in benefits reflecting payments she made towards "Farm Calls/Travel Charges" and medications including Equipoise, Marquis, and Gastrogard.

Great American has argued that Section VI.F of the Major Medical Endorsement excludes coverage for "veterinarian call charges, veterinarian travel, [and] horse transportation." Ms. Greenbank does not dispute this point (nor could she, given that Great American's argument obviously comports with the plain terms of the endorsement), and we accept her silence as a concession.

Great American also maintains that its denial of coverage for Marquis and Equipoise was appropriate, given that Ms. Greenbank had not, at the time she requested coverage, reported any ailments that would have warranted treatment with these medications. Rather, Thomas's only reported illness at that time was pneumonia. Great American thus appropriately concluded that these drugs do not qualify as "necessary veterinary service[s] or product[s.]" Similarly, Great American provides coverage for Gastrogard only where there has been a diagnosis of gastric ulcers, which condition was not then afflicting Thomas.

Ms. Greenbank does not dispute that Thomas was not suffering from any illnesses or injuries that would have warranted treatment with these medications. The arguments she does proffer are entirely irrelevant—for example, that Dr. Stone's fees were reasonable and that Great American should have investigated further to determine whether the medications were appropriate. But the reasonableness of Dr. Stone's fees was not the basis for denial, and an investigation likely would have been futile, given that not even Ms. Greenbank has argued (let alone proffered evidence) that there was a legitimate medical reason to treat Thomas with these medications. Ms. Greenbank's unrelenting

parroting of the phrase "bad faith" is unpersuasive when it is totally removed from any serious acknowledgement or discussion of the material facts and issue.

There is, thus, no evidence that the use of these medications was reasonable and entitled to coverage under the Major Medical Endorsement, and in turn, no evidence that Great American breached this contract. Summary judgment is granted in favor of Great American on this claim.

Having determined as a matter of law that Great American did not improperly deny coverage, it cannot be found to have acted in bad faith. *Kartman v. State Farm Mut. Auto. Ins. Co*., 634 F.3d 883, 891, 2011 WL 488879 (7th Cir. 2011); *Shifrin v. Liberty Mut. Ins*., 991 F. Supp. 2d 1022, 1045, 2014 WL 87877 (S.D. Ind. 2014).

> 2. *Great American Is Entitled to Summary Judgment on Ms. Greenbank's Claims of Statutory, Constructive, and Common Law Fraud (Count VI)*

Ms. Greenbank's Complaint alleges a handful of miscellaneous fraud claims, though the precise theories underlying these claims have been exceedingly difficult to pin down. The following colloquy occurred during the final pretrial conference:

> The Court: Wait just a minute. So you have a fraud claim with respect to representations by the company under the policy?
>
> Counsel: Yes, Your Honor.
>
> The Court: Where is that?
>
> Counsel: Representations relating to her rights along with the delayed tenotomy and what her rights are under the policy –
>
> The Court: You're saying that there was fraud with respect to those representations? Have you asserted a fraud claim on that?
>
> Counsel: Yeah, it was in our summary of issues for trial, your Honor.

27

The Court: Okay, I'm sort of at a loss because I'm trying to figure out where the fraud arises. And it seems like in the – in what you filed with me, that the only fraud that you've alleged is with respect to the short-term renewal of the contract, that there wasn't anything about any other representations about the contract. Why wouldn't the contract control?

Counsel: Why wouldn't the contract – I'm sorry, what was the last part, why doesn't the contract control?

The Court: Yes. I mean, the language of the contract claim, sets out the rights of the parties, the obligations, right? So I'm just trying to figure out where you have anchored your fraud claim, and the only place that I can find in your filings is to the short-term renewal payment, that there was fraud connected with use –

Counsel: The –

The Court: Just a minute, let me finish. There's a fraud with respect to using her premium for the short-term renewal, that that's where the fraud arose. Now is there other fraud that you have alleged? And if so, tell me where it is.

Counsel: That's basically it, Your Honor.

The Court: That's it? So emotional damages that flow  from the fraud is confined to the facts and circumstances of the short-term renewal of the policy; is that right?

Counsel: Yes, Your Honor.

The Court : So if you prevailed on that issue, the plaintiff would get $1,743, which was the amount that she says was wrongfully spent of her money, and whatever emotional damage she suffered from that; is that right?

Counsel: From the fraud, yes, Your Honor.

The Court: And that is the fraud? That's what I'm trying to establish.

Counsel: Yes, Your Honor.

The Court: That is the fraud you've asserted. Okay.

[Dkt. 199, pp. 36–37].

Consistent with these representations and Ms. Greenbank's briefing on this issue of fraud, we consider whether Great American committed fraud when it issued the short-term policy, providing Ms. Greenbank with mortality coverage for an additional 60-days following the termination of the initial Policy.

"To successfully sustain an action for common law fraud, a party must prove five essential elements: (1) a material misrepresentation, (2) of past or existing facts, (3) the falsity of the representation, (4) the representation was made with knowledge or reckless ignorance of its falsity, (5) and detrimental reliance on the representation." *Cash in a Flash, Inc./Hobart v. Hoff*man, 841 N.E.2d 644 (Ind. App. 2006). Similarly, statutory fraud requires that a person "knowingly and intentionally" made a "false or misleading statement" or "create[d] a false impression in a third person." *See* Ind. Code. § 35-43-5-4. Finally, the elements of constructive fraud are: "(1) a duty owing by the party to be charged to the complaining party due to their relationship; (2) violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists; (3) reliance thereon by the complaining party; (4) injury to the complaining party as a proximate result thereof; and (5) the gaining of an advantage by the party to be charged at the expense of the complaining party. *Harmon v. Fisher*, 56 N.E.3d 95, 99 (Ind. App. 2016).

Ms. Greenbank's allegations of fraud, considered in light of these essential elements of such a claim, border on frivolous. There is *no* evidence of *any* material misrepresentations from Great American. Ms. Greenbank's briefing is comprised entirely of conclusory allegations and confusing incantations of legal theories unsupported by any

29

facts of this case. She contends, without supporting evidence, for example, that Great American "concocted a scheme to eliminate its mortality risk" "by claiming it inadvertently forgot to give the statutorily issued notice of nonrenewal" and thereafter issued a "sham policy."

Indeed, Ms. Greenbank's allegations lack any evidentiary support at all. Great American was fully transparent in reporting to her that it had failed to provide proper notice of nonrenewal and was issuing the short-term policy to ensure that Ms. Greenbank was afforded an opportunity to procure new insurance without losing coverage in the interim. There is *no* evidence that Great American had *any* mal intent in doing so. In addition, there is not an scintilla of evidence that Great American misrepresented *any* terms of the short-term renewal, which policy was fully and timely transmitted to Ms. Greenbank.[10] Ms. Greenbank's theory that Great American somehow concealed or

---

[10] Though Ms. Greenbank's briefing is hardly a model of clarity, from what we can discern, Ms. Greenbank is apparently displeased with the fact that the short-term policy provided coverage only for occurrences arising during the short-term policy period (which seems pretty standard as far as insurance contracts go); she is of the belief that the short-term policy should have provided coverage for Thomas's death if that death resulted from the various ailments giving rise to her initial request for mortality coverage under the original policy. Ms. Greenbank has offered no evidence to support this interpretation of her rights as reasonable under either the original policy or the short-term policy, and no reasonable juror could find that Ms. Greenbank's interpretation was sound. We reiterate that Great American was fully transparent in disclosing its reason for issuing the short-term policy as well as in communicating the terms of the short-term policy. Ms. Greenbank also contends that the short-term policy was somehow fraudulent because the original Policy had a provision entitling her to an additional 120-days of coverage if the Policy was not renewed. *See* Section II(A)(2). She thus contends that Great American should have honored this provision rather than retaining premiums for the short-term policy. What is missing from this theory is any evidence establishing deceptive behavior or misleading communications from Great American regarding the short-term renewal. Great American clearly communicated to Ms. Greenbank that it believed she had failed to satisfy various conditions precedent to the renewal, thereby forfeiting her rights to benefit from the Policy's provisions. If anything, Ms. Greenbank's

mispresented these terms is at best underdeveloped, certainly unpersuasive, and ultimately untenable. That perhaps Ms. Greenbank (who was, at this time, represented by counsel as well as an independent insurance agent) failed to appreciate the terms of this policy does not give her license to continue to pepper Great American with unsubstantiated claims of fraud.[11] S*afe Auto Ins. Co. v. Enter. Leasing Co. of Indianapolis*, 889 N.E.2d 392, 397 (Ind. Ct. App. 2008) ("[I]nsureds have a duty to read and to know the contents of their insurance policies.").

Moreover, aside from a one-sentence averment that she detrimentally relied on Great American's misrepresentations, there is no evidence in the record showing that Ms. Greenbank did, in any way, rely to her detriment on Great American's representations regarding the short-term renewal policy.

For these reasons, Ms. Greenbank's allegations of fraud do not hold up, and Great American is entitled to summary judgment on these claims.

3. *Ms. Greenbank's Negligence (Count VIII) Claim Fails*

We turn now to Ms. Greenbank's claim against Great American for common law negligence. To prove negligence, a party must show: (1) a duty owed to the plaintiff by the defendant; (2) a breach of that duty by the defendant; and (3) an injury to the plaintiff

---

argument that Great American should have honored the 120-day provision sounds in breach of contract, not fraud, though she did not allege any such breach of contract allegations.

[11] Ms. Greenbank's briefing indicates that discovery revealed that Great American had misled her regarding this policy. It is entirely unclear what specific discovery she is referencing or what it revealed. In truth, her complaint, obviously filed before any discovery was conducted, contains the very same allegations that she advances at this belated stage of this litigation.

proximately caused by that breach. *Severance v. New Castle Cmty. Sch. Corp.*, 75 N.E.3d 541, 546 (Ind. Ct. App. 2017).

In her complaint, Ms. Greenbank alleges that Great American owed her a duty "to use reasonable care to protect [her] investment in Thomas while in [Great American's] possession, to act in [her] best interest and to not take action contrary to [her] interests so as to damage [her] property." [Am. Compl. ¶ 128]. Much like her claims for fraud, the precise nature of Ms. Greenbank's negligence theory remains difficult to pin down as it has been throughout this litigation. We refrained from ruling on this issue previously on summary judgment "on the grounds that the parties' briefings on this issue [were] wholly underdeveloped, leaving the Court with more questions than answers." [Dkt. 123, at 53].

Following that summary judgment ruling, Great American conducted a second deposition of Ms. Greenbank, attempting to acquire an understanding of her theory of liability. The following exchange during the deposition included this colloquy:

> Counsel:  . . . I am going to be asking you some questions today about your damages that you're claiming in this case today.
>
> Ms. Greenbank: Yes.
>
> Counsel: I'm – I want to start first with the damage that you claim was caused to Thomas. Would you agree that before Thomas was sent to Lexington that you thought he was worth $500,000?
>
> Ms. Greenbank: Yes.
>
> Counsel: And you would agree that after the tenotomy that was performed in Lexington that you believe his value is zero?
>
> Ms. Greenbank: Yes.
>
> [. . .]

Counsel: Do you – was anything else done to Thomas  that you know that damaged him?

Ms. Greenbank: The tenotomy is what kept him from being a show horse.

[Dkt. 223-1, Exh. J].

Based on this exchange, Great American contends that it has become clear that Ms. Greenbank's negligence theory is premised on Ms. Greenbank's continued belief that Great American acted unreasonably in authorizing the tenotomy and caused damages  to Plaintiff from Thomas's being subjected to that procedure.

We agree with Great American's assessment that Ms. Greenbank's theory of negligence is connected to the tenotomy. We further agree that this theory of liability is foreclosed by the economic loss doctrine. This doctrine forecloses recovery in tort where the party's alleged injuries reflect pure economic losses (such as the diminished value in property, i.e., a horse that can no longer be showed) and the parties' obligations to one another are contractually defined. *See, e.g., Progressive Ins. Co. v. Gen. Motors Corp*., 749 N.E.2d 484, 488 (Ind. 2001); *JMB Mfg., Inc. v. Child Craft, LLC*, 799 F.3d 780, 785, 2015 WL 5000728 (7th Cir. 2015); *Indianapolis-Marion Cty. Pub. Library v. Charlier Clark & Linard, P.C*., 929 N.E.2d 722, 737 (Ind. 2010). Stated otherwise, the economic loss doctrine bars tort actions that sound exclusively in contract law. *JMB Mfg., Inc*, 799 F.3d at 785 ("The rule reflects the general principle that contract law is better suited than tort law to address the problem of commercial losses caused by mere negligence."); *Progressive Ins. Co.*, 749 N.E.2d at 488. ("[W]here the loss is purely economic, and there is no damage to other property and no personal injury, the legislature has determined that

the plaintiff's remedy lies in contract law."). Accordingly, Ms. Greenbank cannot invoke the tort of negligence as a means of imposing liability on Great American, given that its duties to her were entirely defined by the contract. Notably, Ms. Greenbank does not dispute this point.

That concession has not prevented her from, once again, throwing out undeveloped and unsubstantiated arguments. She contends, for example, that Great American had a duty to return to Thomas to her and that it committed negligence when it failed to do so. This is obviously nothing more than a repackaging of Ms. Greenbank's conversion claim, which failed in the first round of summary judgment briefing. She also asserts that the economic loss doctrine does not encompass damages to Thomas following the termination of the Policy. While perhaps true, Ms. Greenbank, after nearly three years of litigation and two rounds of summary judgment, has mustered *no* evidence of such damages (and it remains unclear what these damages would entail, given her belief that Thomas's value was "zero" once the tenotomy was performed).[12]  Moreover, she conceded in her deposition that her damages all trace back to and exclusively arise from the tenotomy. We will not permit Ms. Greenbank to utilize summary judgment briefing to further expound on this unsubstantiated factual claim and legal theory.

### 4. *Great American Did Not Commit Criminal Mischief*

Ms. Greenbank has included a claim against Great American for criminal mischief, pursuant to Indiana's Crime Victims Relief Act ("CVRA"), Ind. Code § 34-24-

---

[12] Ms. Greenbank's remaining arguments in this section of her briefing are so confusing and jumbled that we simply are at a loss to know how to sort them out.

3-1, which affords victims of various crimes a civil remedy. Criminal mischief occurs where one person has  "recklessly, knowingly, or intentionally damage[d] or deface[d] property of another person without the other person's consent[.]" Ind. § Code.  35-43-1-2; *Lindsey v. DeGroot,* 898 N.E.2d 1251 (Ind. App. 2009).

Ms. Greenbank's claim of criminal mischief is based on her continued belief that Great American unlawfully "damaged" Thomas. [Am. Comp. ¶ 108-112]. As with Ms. Greenbank's negligence and fraud claims, the precise legal theory of "criminal mischief" was not developed at summary judgment.

We interpret her criminal mischief claim as nothing more than another iteration of her theory that Great American unlawfully damaged Thomas when it authorized the tenotomy, which claim we have rejected, holding that Great American's actions were reasonable under the Policy. Thus, there is no basis on which to find the Company liable for criminal mischief. Summary judgment is granted in favor of Great American on this claim.

   5. *Great American Did Not Commit Statutory or Tortious Conversion When It Retained Ms. Green's Funds (Counts IV and VII)*

Finally, Ms. Greenbank charges Great American with having committed tortious and statutory conversion by knowingly exerting unauthorized control over her premium in the sum of $1943 paid to activate the short-term renewal policy. Ms. Greenbank's statutory conversion claim is governed under the CVRA, Ind. Code § 34-24-3-1.

With respect to Ms. Greenbank's allegation that Great American committed tortious conversion by retaining the premium, a demand for the return of those funds

appears to be required. As we have previously explained, "Where the initial possession is lawful, civil conversion occurs only after an unqualified demand for return." *O.K. Sand & Gravel, Inc. v. Martin Marietta Corp.*, 786 F. Supp. 1442, 1450 (S.D. Ind. 1992) (*quoting Coffel v. Perry*, 452 N.E.2d 1066, 1069 (Ind. Ct. App.1983); *see also Aaron MacGregor & Associates, LLC v. Zhejiang Jinfei Kaida Wheels Co.,* 328 F. Supp. 3d 906, 929, 2018 WL 3062404 (N.D. Ind. 2018). However, if the initial possession was unlawful, the tort victim need not issue an unqualified demand. *O.K. Sand & Gravel, Inc.,* 786 F. Supp. at 1450.

We begin our review of Ms. Greenbank's tortious conversion claim noting that there is no legitimate dispute that Great American's initial possession of the funds was lawful: Ms. Greenbank submitted a request to renew her Policy, accompanied by a check in the full amount of the premium. Great American ultimately determined that it would not renew her Policy, communicating to her that it did not believe she had satisfied the conditions precedent entitling her to the benefits of the Guaranteed Renewal Endorsement. It nonetheless issued a short-term renewal policy to allow her time to find new coverage, returning to her a check in an amount less the short-term renewal coverage costs. Ms. Greenbank's contention that the initial action of retaining the partial premium was somehow unlawful is based entirely on her unsubstantiated cries of "fraud" and "shams," which arguments we have addressed and dismissed previously. She cites to no authorities as support for her theory that an insurance company acts unlawfully when it retains a portion of a premium which, in turn, provides the insured with the requested coverage, especially where there was no objection from the insured for the duration of the

36

policy indicating that she wished to cancel the policy.[13] We know of no such case law to support this theory of relief.

    Accordingly, we hold that Great American is correct in maintaining that Ms. Greenbank was required to make an "unqualified demand" for return in order for this claim to survive summary judgment. *Aaron MacGregor*, 328 F. Supp. 3d at 239. Since it is uncontested that no demand has occurred,[14] Ms.Greenbank's tortious conversion claim fails. Summary judgment shall enter in favor of Great American on this claim.

    Regarding Ms. Greenbank's claim for statutory conversion, for which a "demand" is not a prerequisite, her theory of entitlement to relief is similarly unavailing. *O.K. Sand & Gravel, Inc.,* 786 F. Supp. at 1450 ("The elements necessary to establish conversion are those found in the criminal statute . . . While a demand for return may be evidence as to the intent element, it is not itself an element of criminal conversion."). The relevance of a lack of a demand is that it may negate the necessary *mens rea* element of statutory conversion, that is, the defendant's knowing or intentional exertion of unauthorized control over another's property. *Id.* at 1451; *Smeigh v. Johns Manville, Inc.,* 643 F.3d 554, 563, 2011 WL 2555819 (7th Cir. 2011). This is the case because, without a demand, a party may not "know" that it has exerted unauthorized control of another's property. *Id.*

---

[13] Ms. Greenbank maintains that she did not want the short-term renewal policy; rather, she wanted the policy to be renewed for the full year. As discussed, however, Ms. Greenbank never rejected Great American's issuance of the short-term renewal, accepting the benefits thereof, which is ultimately fatal to her claim that Great American acted unlawfully.

[14] Ms. Greenbank argues that a demand may not have been necessary if it would have been futile: however, she has failed to show in any way that such a demand in these circumstances would have in fact been futile.

A defendant's reasonable belief that it has controlled or continued to control property without the owner's consent defeats the *mens rea* element of conversion. *Smeigh*, 643 F. 3d at 563. *Whitlock v. Brown*, 596 F.3d 406, 413 (7th Cir. 2010).

Here, Great American contends that, to the extent its possession of the premiums was unauthorized, such possession was not "knowing" or "intentional." Prior to this litigation, (which was initiated the day before the short-term renewal expired),[15] Ms. Greenbank *never* objected to the short-term renewal or demanded a return of the partial premium. In fact, her insurance agent believed, pursuant to conversations with Ms. Greenbank, that Ms. Greenbank had accepted this renewal. Ms. Greenbank has offered *no* argument or explanation  or evidence (beyond those that we have already rejected, to wit, that the policy was a "sham") that could raise a reasonable inference that Great American knowingly acted without authorization when it retained possession of the premiums. While determining if a defendant acted with the requisite *mens rea* is generally a question of fact, there is no evidence before us that would allow a reasonable juror to conclude that Great American "knowingly or intentionally" exercised unauthorized control over Ms. Greenbank's funds as is necessary to establish liability under the CVRA. *Smeigh,* 643 F.3d at 563, 577 (affirming award of summary judgment to defendant on statutory conversion claim where plaintiff had never objected to the defendant's retention of his

[15] Ms. Greenbank argues that her initiating this litigation could be construed as a demand. We are unpersuaded by this argument, particularly in light of the fact that Ms. Greenbank waited until the day before the short-term policy was set to expire to file her complaint. If we were to adopt Ms. Greenbank's argument, she would have received all the benefits of the short-term renewal and also be entitled to recover the premium paid for this coverage.

property nor demanded the return thereof). In these circumstances, summary judgment is appropriate. *Id.*

For these reasons, summary judgment is granted in favor of Great American on the common law and statutory conversion claims brought against it relating to its possession and retention of the partial premium funds.

## **CONCLUSION**

Great American's Motion for Summary Judgment [Dkt. 206] is **granted.** Ms. Greenbank's Motion for Reconsideration (including the imbedded Motion to Certify) and her Motion for Leave to Supplement Response [Dkt. 215, 227] are **denied.**

The parties shall bear their own costs, respectively. Final judgment shall enter by separate document. FED. R. CIV. P. 58(A).

IT IS SO ORDERED.

Date:        8/13/2021

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution to counsel of record via CM/ECF